573 So.2d 750 (1990)
Roosevelt JACKSON and Annie Grant
v.
HUDSPETH MENTAL RETARDATION CENTER.
No. 07-CA-59317.
Supreme Court of Mississippi.
December 19, 1990.
Christopher A. Tabb, Brandon, for appellants.
Mike C. Moore, Atty. Gen., Belinda J. Stevens, Sp. Ass't. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and SULLIVAN, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Roosevelt Jackson and Annie Grant were dismissed by the Hudspeth Mental Retardation Center, a facility operated by the State of Mississippi, and they appealed their termination to the Employees Appeal Board, which upheld the termination. Jackson and Grant then appealed that decision to the Rankin County Circuit Court, which affirmed the action of the Employees Appeal Board. They assign the following issues for determination:
I. The lower court erred in upholding the terminations of appellants based upon their refusals to submit to polygraph examinations.
II. In making the determination to terminate the appellants, Hudspeth failed to balance appellants' constitutionally protected interests in continued employment against the state's interest in operating facilities caring for the mentally retarded.

*751 FACTS
On August 30, 1985, Roosevelt Jackson and Annie Grant were on duty at Dogwood Cottage, one of nine state run intermediate care facilities for mentally retarded children at the Hudspeth Mental Retardation Center. Jackson was charged with watching a group of approximately fifteen residents in a den area at one end of the cottage. On the morning in question, Jackson was responsible for two groups of residents, two residents of which had violent propensities and were normally supervised "one on one" by individual staff members.[1] Grant was the supervisor for the end of the building containing Jackson and the residents. Except for Jackson and Grant no other employees were present there.
Between 8:15 and 8:30 a.m., Jerry Smith, one member of the aforesaid two groups, created a disturbance and ran from the den area. Smith was one of the two residents who had been known to have violent propensities and at times was supervised "one on one" by the staff. Grant called Jackson to retrieve Smith, which he did within one to two minutes. A few minutes later, Jackie Miller, a staff member, arrived at the cottage to take the two groups to school and noticed that Smith had been injured. There was an injury to Smith's neck, which drew blood and appeared to be caused by a cord or wire type object. Smith also had several bruises on his back and buttocks.
An investigation into Smith's injury was launched by Avery Slay, Hudspeth's Personnel Director, and Charlie Walker, Hudspeth's Director of Resident Living. Grant and Jackson gave statements to the investigators as to the events of the August 30, 1985, incident. With the investigation unable to develop any leads into the cause of Smith's injury, Grant and Jackson were asked to take a polygraph test.[2] Grant initially agreed to take the polygraph test. Jackson, while at first refusing to submit to such an examination, did agree to take a polygraph test after thirty to forty minutes of persuasion by Slay and Walker. Jackson and Grant were the only employees requested to take a polygraph test in regards to this incident.
Subsequently, Jackson called Slay and informed him that he changed his mind and that he would not submit to a polygraph examination. Grant also informed Slay that she had changed her mind and would not take such an examination. Jackson and Grant were each summoned to Slay's office and were informed that their refusal to take a polygraph test could result in their termination. Both employees continued to refuse to submit to a polygraph examination and ultimately had their employment with Hudspeth terminated as a consequence of such refusal.
Jackson and Grant appealed their termination to the Employees Appeal Board which upheld the action. Relief from such decision was sought from the Circuit Court of Rankin County, which denied the same, upholding the Employees Appeal Board's ratification of Grant and Jackson's termination.

DISCUSSION

I.
Appellants contend that it was unreasonable to require them to submit to a polygraph examination and to terminate them for refusing such an examination. The appellants and appellee both cite Knebel v. City of Biloxi, 453 So.2d 1037 (Miss. 1984). This Court held in Knebel that when public employees refuse to take a polygraph examination, when reasonably ordered to do so by a state agency, the refusal authorizes the agency to discharge such employees. Knebel and the principle expressed therein are a bulwark to the position of the appellee.
Hudspeth Center had the duty and responsibility of investigating injuries to the child in question to the fullest possible extent under the law. The appellants were the only persons in that part of the building where the injured child and other students were being supervised. Likewise, it *752 was the duty of the appellants to cooperate with Hudspeth Center in the investigation of the incident. Other jurisdictions have held that requiring a polygraph test does not violate an employees' constitutional rights, if the request to make a test was reasonable under the circumstances, even though a refusal to take a polygraph test could result in termination of an employee. Campbell v. Personnel Bd. of Kansas City, 666 S.W.2d 806 (Mo. App. 1984); McGinigle v. Greenburgh, 48 N.Y.2d 949, 425 N.Y.S.2d 61, 401 N.E.2d 184 (1979); See Swope v. Florida Indus. Commission Unemployment Compensation Board of Review, Division of State Police, 159 So.2d 653 (Fla.App. 1963); Creadeur v. Department of Public Safety, 364 So.2d 155 (La. App. 1978); Frey v. Department of Police, 288 So.2d 410 (La. App. 1974).
The appellants attempt to distinguish Knebel from the case at bar but we are not persuaded. In our opinion, Knebel controls the decision in this case and the issue is resolved against the appellants.

II.
Appellants contend that their constitutional rights have been violated but admit that Hudspeth Center's application of the pre-termination process utilized in the handling of Jackson and Grant's case was proper. We recognize it is a settled principle that a public employee, having a cognizable property interest in continued employment, is guaranteed a certain amount of procedural protection before being deprived of that interest. Pinson v. Hendrix, 493 F. Supp. 772, 777 (N.D.Miss. 1980).
Jackson, on September 2, 1981, and Grant, on August 18, 1981, both signed an "Acknowledgement of Personnel Policies", which stated:
I have received a copy of, read, and understand the personnel policies as outlined in the State of Mississippi Employee Handbook and the Department of mental Health Addendum to Employee Handbook, amended 4-1-81. I also understand that I may be required to take a polygraph examination concerning any of the personnel policies contained in these handbooks.

As an employee of this institution and knowing my employment is dependent upon my compliance with these rules and regulations, I will follow these guidelines.
Prior to their termination, Jackson and Grant were both advised as to the limited scope and nature of the polygraph test.
(1) The purpose of the polygraph would be to verify your statement concerning the injuries to the resident.
(2) The questioning would be specifically about your duties as a public employee.
(3) Nothing you said during the polygraph examination would be used against you in a subsequent criminal proceeding.
(4) It was explained to you that refusal to take a polygraph examination may lead to your termination.
Even with the above information, Jackson and Grant refused to comply with the investigation by not taking the polygraph examination. We are of the opinion that Hudspeth Center's termination of Jackson's and Grant's employment did not violate their federally guaranteed right to due process and the issue is resolved against them. There being no errors in the proceedings below, the judgment of the Circuit Court is affirmed.
AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] Under ideal circumstances, staff members oversee groups of seven or eight residents.
[2] A polygraph machine is what is popularly known as a lie detector.