815 So.2d 61 (2002)
Johnny M. EVANS, Sr.
v.
DeRIDDER MUNICIPAL FIRE and Police Civil Service Board.
No. 2001-C-2466.
Supreme Court of Louisiana.
April 3, 2002.
Rehearing Denied May 24, 2002.
*63 David R. Lestage, DeRidder, Counsel for Applicant.
Charles A. "Sam" Jones, III, DeRidder, Counsel for Respondent.
VICTORY, J.
We granted this writ application to determine whether the finding of the DeRidder Municipal Fire and Police Civil Service Board (the "Board"), that Johnny Evans, Sr. ("Evans") was dismissed in good faith and for cause, was supported by competent evidence. After reviewing the facts and the applicable law, we find that there is competent evidence in the record to support the Board's ruling.

*64 FACTS AND PROCEDURAL HISTORY
On August 14, 1997, Earnest Prater, Jr. ("Prater") was arrested by DeRidder City Police in connection with a drive-by shooting. Evans, a member of the DeRidder City Police force, conducted the interview of Prater and at Prater's request, contacted Beauregard Parish Deputy Sheriff Betty Pichon ("Pichon"), a member of the Narcotics Task Force. Prater told Pichon that he knew someone who had drugs, which led the police, including Evans, to the home of Eric Pickens ("Pickens"), where drugs were found and Pickens was arrested.
Prater, who was co-operating with the police, was not booked and was released. Pickens was released on bond. On August 28, 1997, Prater was murdered. On August 28, 1997, Pichon took Pickens to the DeRidder Police Department and advised Sergeant John Gott that Pickens possibly had information concerning a motive in the murder of Prater. Pickens was not a suspect at that time. However, Pickens told Sergeant Gott and other officers that some time the week before, while Pickens was at Evans' residence, Evans told him that Prater was working for the police and that Prater had "busted" Pickens and another person. On August 31, 1997, Pickens gave a statement to Vernon Parish Sheriff's Deputies that Evans had told Pickens and Evans' son, Johnny Evans, Jr. ("Johnny"), that Prater had turned Pickens and another person in to the authorities. In this statement, Pickens also admitted that he was involved, to some extent, in the murder of Prater. Pickens later pled guilty to manslaughter in connection with Prater's death. Johnny was also arrested in the murder of Prater, and was convicted of second degree murder.
Upon learning of Pickens' allegations that Evans had disclosed confidential information which may have led Pickens and Johnny to kill Prater, DeRidder Chief of Police Arvin Malone ("Chief Malone") began an investigation. On September 25, 1997, Chief Malone sent a letter to Evans, informing him that he was under investigation and informing him of his rights. The letter also explained that Evans would have to take a polygraph examination.[1] In October, Evans took a polygraph examination administered by ABC Investigators, Inc., and as a result, the polygraphist, Pete Trahan, notified Chief Malone that Evans "has not told the entire truth to all of the pertinent questions" on the polygraph test.[2] As a result of the polygraph, *65 Chief Malone recommended to Mayor Gerald Johnson that Evans be dismissed from his employment effective October 31, 1997. Mayor Johnson agreed and approved the dismissal.
Evans appealed his dismissal to the Board, which held a hearing on December 18, 1997. At the hearing, Evans testified that he did not tell Pickens or his son that Prater was a confidential informant. The City attorney sought to present the testimony of Pickens and Johnny regarding the statements Pickens made to the police, but, because criminal charges were then pending against them in the death of Prater, they invoked their Fifth Amendment privileges and refused to testify. Thus, the City introduced the two statements Pickens made to the authorities. Chief Malone testified that, because of the conflicting statements by Pickens and Evans, he ordered Evans to take a polygraph, and that, because Evans failed the polygraph, he was fired. The polygraphist also testified regarding his training and experience, his testing method, the questions asked on the test, and his opinion that Evans had not told the entire truth on the key questions at issue, namely, whether he had told Pickens that Prater was a confidential informant.
Based on the evidence presented, the Board found that the alleged violation by Evans did occur, and that the appointing authority acted in good faith and for cause in the discharge of Evans, and upheld the dismissal. On October 9, 2000, the trial court affirmed, finding that the Board's decision was not arbitrary and capricious and was supported by the evidence. Contrary to Evans' arguments, the trial court found that Pickens' statements were admissible because hearsay is admissible in administrative hearings, and the statements were an exception to the hearsay rule under La. C.E. 804(B)(3) as statements against interest. The trial court held that the results of the polygraph are admissible in administrative hearings within judicial discretion on a case-by-case basis.
The Third Circuit Court of Appeal reversed, finding that the polygraph: (1) was inadmissible as unreliable and irrelevant; (2) that it usurped the fact-finder's role; and, (3) was inadmissible under La. C.E. 607 to attack a witness's credibility. Evans v. DeRidder Municipal Fire & Police Civil Service Board, 01-118 (La.App. 3 Cir. 6/27/01), 789 So.2d 752. Because it ruled that the trial court committed legal error in admitting the polygraph, the court of appeal conducted a de novo review of the record and found that one of Pickens' statements to the police was inadmissible as well, in that it did not fall under any hearsay exception and was inconsistent with the other statement he made. As a result of these conclusions, the court of appeal found that the Board did not possess sufficient cause to terminate Evans, and restored Evans to his former position. We granted the City's writ. Evans v. DeRidder Municipal Fire & Police Civil Service Board, 01-2466 (La.12/14/01), 803 So.2d 977.

DISCUSSION
"In civil service disciplinary cases, an appellate court is presented with a multifaceted review function." Bannister v. Dept. of Streets, 95-C-0404 (La.1/16/96), 666 So.2d 641, 647 (citing Walters v. Department of Police of the City of New Orleans, 454 So.2d 106 (La. *66 1984)). "First, as in other civil matters, deference will be given to the factual conclusions of the Commissioner." Id. The Commissioner, or Board, has a duty to decide independently from the facts presented whether the appointing authority [the Mayor] had good or lawful cause for taking the disciplinary action, and, if so, whether the punishment imposed is commensurate with the dereliction. Walters, supra. "Hence, in deciding whether to affirm the Commission's factual findings, a reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review." Id. "Second, in evaluating the Commission's determination as to whether the disciplinary action is both based on legal cause and commensurate with the infraction, the court, should not modify the Commission's order unless it is arbitrary, capricious, or characterized by abuse of discretion." Id.
Under La. Const. Art. X, § 8(A), employees with permanent status in the classified civil service may be disciplined only for cause expressed in writing. Further, under the Louisiana Constitution, "cause" for the dismissal of such a person includes conduct prejudicial to the public service involved or detrimental to its efficient operation. La. Const. art. X, § 8(A). Here, there is no dispute that if Evans disclosed the confidential information, there would be sufficient cause for his dismissal.
The primary issue in this case is whether the evidence introduced at the administrative hearing to prove that Evans disclosed confidential information was admissible. In administrative hearings, the hearing officer has the discretion to admit evidence that would otherwise be inadmissible under the Louisiana Code of Evidence. Chaisson v. Cajun Bag & Supply Co., 97-1225 (La.3/4/98), 708 So.2d 375, 381. Rule 10.4 of the Rules of Civil Service Commission provide that "[t]he rules of evidence as applied in civil trials before the courts of this state need not be strictly complied with but the board shall limit evidence to matters having a reasonable relevance to the issues before the board." Further, the findings of the Board must be based on competent evidence. Chaisson, supra; Gant v. Department of Police, 99-1351 (La.App. 4 Cir. 1/5/00), 750 So.2d 382, 387, writ denied, 00-0688 (La.4/20/00), 760 So.2d 1161; Cittadino v. Department of Police, 558 So.2d 1311, 1315 (La.App. 4 Cir.1990).
Evans claims, and the appellate court found, that the polygraph results were inadmissible at the administrative hearing before the Board. We disagree.[3] Police officers throughout the land are routinely subjected to polygraph tests, in both the pre-employment screening process and in investigatory actions involving official misconduct. In fact, the Employee Polygraph Protection Act of 1988, which generally prohibits private employers from using polygraphs in the workplace, contains an exception for federal, state and local government employees. See 29 U.S.C. §§ 2001-2008.[4] Further, Louisiana courts have long recognized that a civil service employee may be ordered to take a *67 polygraph, and that the employee can be suspended or discharged for failing to take a polygraph. See Creadeur v. Department of Public Safety, Div. of State Police, 364 So.2d 155 (La.App. 1 Cir.1978); Lemoine v. Department of Police, 301 So.2d 396 (La.App. 4 Cir.1974); Frey v. Department of Police, 288 So.2d 410 (La.App. 4 Cir. 1973); Dieck v. Department of Police, 266 So.2d 500 (La.App. 4 Cir.1972); Clayton v. New Orleans Police Dep't, 236 So.2d 548 (La.App. 4 Cir.), writ denied, 256 La. 867, 239 So.2d 363 (1970); Roux v. New Orleans Police Dep't, 223 So.2d 905 (La.App. 4 Cir.), writ denied, 254 La. 815, 227 So.2d 148 (1969); see also Jackson v. Hudspeth Mental Retardation Center, 573 So.2d 750 (Miss.1990) (where the Supreme Court of Mississippi held that a civil service employees could be ordered to take a polygraph, and could be fired for refusing to submit to the polygraph). However, nothing a police officer says in a polygraph can be used against him in a subsequent criminal proceeding. See Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (holding that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under the threat of removal from office, and that it extends to all ..."); see also Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (policeman who refused to waive his constitutional privilege against self-incrimination in connection with a grand jury proceeding investigating alleged bribery and corruption of police officers, cannot be discharged for his refusal to waive his rights).
This Court has held that polygraph results are per se inadmissible in criminal trials. State v. Catanese, 368 So.2d 975 (La.1979) (holding that "[a]lthough we conclude that polygraph evidence is inadmissible in criminal trials, the reasons for our decision do not prevent its introduction in post trial proceedings"). In Catanese, this Court expressed the following policy reasons for the per se exclusion of polygraph results in criminal trials:
(1) that the trier of fact would give conclusive weight to the polygraph expert's opinion;
(2) that the polygraph technique is only capable of a high degree of accuracy when conducted under controlled conditions by an examiner who is highly qualified, and, in Louisiana, there are no laws providing for the licensing, regulating and disciplining of polygraph operators; and
(3) that extensive procedural safeguards need to be established by courts or legislators before polygraphs are allowed to be introduced at trial.
368 So.2d at 981-982.
However, a leading commentator has advanced a number of reasons for treating evidentiary issues in administrative proceedings differently, including: (1) administrative proceedings may encompass both legislative and adjudicative functions; (2) juries are not involved and the factfinder is usually a person with special expertise in the subject matter of the inquiry; (3) the judicial officer also exercises investigative functions; and (4) non-lawyers frequently are involved in the process. Frank l. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, Vol. 19, § 1.2, p. 6 (1999). Further, contrary to the policy concerns expressed in Catanese relative to criminal trials, in an administrative proceeding concerning disciplinary action against a police officer, "appellant's position as a police officer, burdened with the additional distinguishing feature of his employment that he is a symbol of public trust and law enforcement who must remain above all suspicion which might tend *68 to lessen this image and that of the entire police department, demand[s] an immediate corroboration of his statement denying any wrongdoing...." Frey, supra at 412. In addition, in 1980, after the decision in Catanese, Louisiana enacted a statute regulating polygraphists, La. R.S. 37:2831, et seq. We find that these policy reasons support the admissibility of the polygraph results in this case.
Further, Chief Malone was faced with a very serious accusation against one of his police officers, as it involved the possible disclosure of confidential information which may have led to the murder of the informant. In the face of Evans' denial, Chief Malone had the right, under both state and federal law, to order Evans to take a polygraph test. Surely, he should have the right to use this evidence at an administrative hearing to justify his decision recommending that Evans be dismissed.
Having found no reason for barring the admission of the polygraph evidence in this case, we must now determine whether the results of this polygraph test were admissible in the administrative hearing as "competent" evidence. In Chaisson, we held that "competent" evidence was evidence that "has some degree of reliability and trustworthiness and is of the type that reasonable persons would rely upon" and that "this determination must be made on a case-by-case basis under the particular facts and circumstances." 708 So.2d at 382. "The reviewing court must evaluate the competency of the evidence under the manifest error standard." Id.
At trial, the polygraphist testified that he had been licensed in the State of Louisiana since 1985 to conduct polygraphs, that he had conducted between 500-600 polygraphs, that he was board certified, and that he conducted polygraphs for numerous state agencies. He admitted that the polygraph was not 100% accurate and was cross-examined vigorously on the possible inaccuracies of the polygraph. Sheriff Malone testified that he considered the possibility that Evans' polygraph results may not have been accurate in making his decision to fire Evans. Finally, no irregularities in the test were established that would be grounds for excluding the polygraph in this case. See Arnold v. New Orleans Police Dept., 383 So.2d 810 (La.App. 4 Cir.), writ denied, 385 So.2d 274 (La.1980) (finding that the polygraph was inadmissible because the police officer and the third party were so intoxicated that their memory of the events was not genuinely reliable).
As previously stated, the Board ruled that the polygraph results were admissible, as it was entitled to do in its discretion. Having reviewed this ruling under the manifest error standard, we find that the polygraph evidence in this case was competent evidence.
Finally, the Board determined the proper weight to be given the polygraph results, as the polygraphist was vigorously cross-examined on the accuracy and methodology of the testing procedures. After weighing the evidence, the Board found that "the evidence and testimony presented to the Board established that the alleged violations did occur" and that "the appointing authority acted in good faith and for cause in the disciplinary action taken against Officer Evans."
Just as police officers can be fired for failing to submit to a polygraph when ordered to do so if the request is reasonable under the circumstances, police officers can be fired if they fail a polygraph. Chief Malone was entitled to present the evidence to the Board that he relied upon in making his decision to recommend *69 Evans' dismissal. Indeed, it would be ludicrous if the appointing authority, in this case the mayor, could fire a police officer based on the results of a polygraph test he was entitled to obtain, but that the appointing authority could not present the evidence to justify his decision to fire the officer at the administrative hearing before the Board. Therefore, we find that the results of a properly administered polygraph are admissible in an administrative hearing before the Board, held to review whether the appointing authority had good or lawful cause for taking disciplinary action against a police officer. It is the province of the Board to determine the weight to be given this evidence. Further, in this case, the Board had other evidence to support the allegation that Evans disclosed confidential information. We find that the Board was not clearly wrong in admitting the polygraph into evidence in order to determine whether Evans was dismissed for cause.[5]
Evans also argues, and the court of appeal agreed, that the out-of-court statements made by Pickens were inadmissible hearsay. On August 28, 1997, Pickens gave a statement of DeRidder Police Officers as follows:
... that some time last week he was at Johnny Evans, Sr. residence on Louise St. He stated that Johnny, Sr. told him in the living room of the res. that Ernest was working for the police, Eric stated that Johnny, Sr., then stated that Ernest had busted Eric and J.J. Johnson. Eric stated that Johnny, Sr. stated to him "Ernest is the Police."
Eric went on to tell officers that this statement from Johnny, Sr. was totally unsolicited and Johnny Sr. had just volunteered the information. Eric stated at the time, Johnny, Jr. was in his room at the house and was not present, Eric went on to tell officers that later he talked to Johnny, Jr. about what Johnny, Sr. had said and Johnny, Jr. stated "didn't I tell you that Ernest was working for the police."
On August 31, 1997, Pickens gave a statement to Vernon Sheriffs deputies, and answered their questions as follows:
Q. Okay. Who told, uh, who told that Ernest was ratting people out or ...?
A. Johnny.
Q. How did he know?
A. He said those dudes on Bishop told him.
Q. On Bishop?
A. He didn't say any names. He said some [people] on Bishop told me that Ernie was the one ratting us out.
Q. He never even told you nobody else at any time, had he ... he had learnt... that Ernest, that was the first that you knew that Ernest was ratting?
A. Yeah, then I went over there and him and his daddy was talking about it.
Q. What did they say?
A. Talking about Ernest was turning people in, and that's why he ain't in jail right now. Cause he got a $70,000 bond.

*70 Q. What did Evans, Sr. say about it?
A. That the only reason Ernest's out right now, is because he's turning people in.
Q. Did he say who he'd turned in, maybe you or anybody else?
A. He said, you and J.J. He say he turned ya'll in, that's why he's out right now.
Q. That was Johnny Evans, Sr. said this?
A. Yes sir.
Q. And when was this here?
A. It was like last week.
Q. Like last week? About what date, give me a date.
A. Like in the middle of the week, I don't even know what day it was ...
Q. Where was ya'll at, when he told you this?
A. We was at his house.
Q. At Mr. Evans' house?
A. Yes sir.
Q. What was ya'll doing?
A. Johnny had went over there, cause he had his son. And he had to babysit that day, so we just went over there and I had my girlfriends little boy. So we went over there and let them play.
Q. Over to Johnny Evans, Sr.'s house?
A. Uh, huh, and his daddy was sitting there talking, talking to us about ...
Q. How did it get brought up?
A. Cause he said, uh, how long you been smoking weed? That's how it came up, he asked me how long I been smoking weed, and I was like, I been smoking for awhile. Like that ... then he was like, you know you can't come to DeRidder and smoke no weed, and people that don't like you, they gonna turn you in. Like that, then I was like, yeah. Look at Ernest Prater, he's turning everybody in.
Q. And Ernest, uh, Johnny Evans Sr. is the one that said that, told you and Johnny Evans Jr.? Was anyone else there with ya'll, when he told you?
A. No, just us three.
Q. Just you three. And he told you that, he had turned you and several more ... J.J., who is he referring to as J.J.?
A. It's a dude named J.J. I don't know him, though.
Q. But Johnny Evans, Sr. had told you that Ernest had turned you and J.J. in?
A. Uh huh. And he said it was some other people, he didn't name them other people.
Q. But he said, he had turned some other people?
A. Yes sir.
Hearsay statements may be admissible in an administrative hearing, provided the evidence is determined to be competent. Chaisson, supra at 382. Further, these two statements fall under the hearsay exception of La. C.E. art. 804(B)(3), as statements against interest. Even though he was not yet a suspect in Prater's murder, Pickens' first statement clearly indicated that he had a motive to kill Prater. Likewise, the second statement, taken after he became a suspect, again provided police with Pickens' motive to kill Prater.
The court of appeal also found that the two statements lacked credibility and trustworthiness, pointing out what it considered to be inconsistencies in the statements.[6] Yet, having determined that the *71 statements were admissible, it was up to the Board, as the trier of fact, to determine the weight to give these statements and to determine whether they were inconsistent. Contrary to the court of appeal's reasoning, the Board could have concluded that the statements reflect that "Johnny," referring to Johnny Evans, Jr., made a statement to Pickens prior to the meeting at Evans' residence to the effect that people on Bishop Street told Johnny that Prater was a police informant. Rather than discredit Pickens, the Board could have concluded that it bolstered Pickens' credibility, because he told DeRidder Police on August 28, 1997 that after Evans told him the information and he in turn told Johnny, that Johnny said, "didn't I tell you that Earnest was working for the police?" Further, the fact that someone else told Johnny or Pickens that Prater was a police informant, in no way lessens Evans' responsibility not to disclose confidential information. The Board may well have concluded that a statement by a trusted and informed police officer would carry more weight, and would more likely be accepted as true by Pickens and Johnny, than rumors heard on the street.
The court of appeal found a second inconsistency in determining that Pickens' statements were untrustworthy, that is, that in one statement he stated that Johnny was present when the disclosure was made, and in another statement he said that Johnny was not in the room when the disclosure was made. However, the Board could have found that both statements recite that Johnny and Pickens were at Evans' residence on the date the disclosure was made, and that Evans volunteered to Pickens that Pickens and "J.J." had been arrested because Prater had turned them into police. Further, even if inconsistent, it is the Board's responsibility to determine the weight of the evidence, which can only be reversed if manifestly erroneous. We find no manifest error here.

CONCLUSION
In administrative hearings involving civil servant disciplinary actions, evidence is admissible if it is competent and has a reasonable relevance to the issues before the board. This determination must be made on a case-by-case basis, and will not be overturned unless manifestly erroneous. Although not 100% reliable, the results of a properly administered polygraph test are competent evidence and are of the type upon which reasonable persons would rely. Further, the two statements made by Pickens constituted exceptions to the hearsay rule as statements against interest under La. C.E. art. 804, and they were not so inconsistent as to be incompetent. Finally, the Board was made well aware of the reliability issues with both the polygraph and the two statements by Pickens, and was entitled to determine the proper weight to be given them. Thus, we defer to the factual conclusions of the Board, and we find that the Board's determination was based on legal cause and commensurate with the infraction, and was not arbitrary, capricious, or characterized by abuse of discretion.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.
*72 REVERSED; TRIAL COURT JUDGMENT REINSTATED.
KNOLL and WEIMER, JJ., concurs and assigns reasons.
CALOGERO, C.J., dissents and assigns reasons.
KNOLL, Justice, concurring.
It is with great reluctance that I concur with the majority's holding allowing the admissibility of polygraph test results in the administrative review of a termination decision. First, I wish to underscore that the use of such evidence is confined to administrative proceedings, and in no way can it be used in criminal trials. See State v. Catanese, 368 So.2d 975 (La.1979).
Furthermore, I feel compelled to caution against expanding the role of polygraph tests, the administration and interpretation of which is recognized to be "a developing and inexact science." See, e.g., United States v. Gilliard, 133 F.3d 809, 812 (11th Cir.1998), citing United States v. Piccinonna, 885 F.2d 1529, 1535 (11th Cir.1989). Just as the majority of the court recognizes that admissibility of polygraph evidence is limited to the type of administrative proceedings utilized in this case, the majority also notes that plaintiff's employer, Chief Malone, sought polygraph evidence as a last resort, a second point which merits additional emphasis.
The majority observed that Pickens and Johnny "both invoked their Fifth Amendment privileges and refused to testify.... Chief Malone testified that, because of the conflicting statements by Pickens and Evans, he ordered Evans to take a polygraph...." Evans v. DeRidder Mun. Fire and Police Civ. Svc. Bd., 01-C-2466, p. 3 (La.2002), 815 So.2d 61, 65. Thus, with Pickens and Johnny unavailable to testify, Chief Malone was left in a precarious position. On the one hand, allegations of profound misconduct were made against one of his officers, a person in a position of great public trust, and on the other hand, to learn the truth, Chief Malone had only hearsay statements and the conflicting word of the officer.
To get to the heart of matter, Chief Malone resorted to a polygraph test. It was a last resort, and the majority's opinion indicates that the evidence garnered from the test could not alone decide the matter: "It is province of the Board to determine the weight to be given this evidence. Further, in this case, the Board had other evidence to support the allegation that Evans disclosed confidential information." Evans, 01-C-2466, 815 So.2d at 69 (emphasis added).
Accordingly, the majority saves for another day the question of whether polygraph evidence alone could justify a termination decision, or indeed, justify by itself any other governmental action. Even so, the point should not be lost that in the instant case, this court sanctioned the initial step, i.e., the decision to administer a polygraph test, only after finding that the proponent of the test was left with no other viable options. In so doing, while finding polygraph evidence admissible under these limited circumstances, the majority's holding can be said to stand for the proposition that future efforts to employ machinery to diagnose human veracity should likewise be employed rarely and sparingly. However, I would not leave this significant caveat to be implied, but would explicitly so hold.
WEIMER, J., concurring.
I concur with the majority opinion, but note the well written and thorough opinion of Judge Woodard which found the polygraph test results inadmissible. Evans v. DeRidder Municipal Fire & Police Civil Service Board, 01-0118 (La.App. 3 Cir. *73 6/27/01), 789 So.2d 752, writ granted, 01-2466 (La.12/14/01), 803 So.2d 977. I am persuaded to concur because a law enforcement officer can be terminated from employment for failure to submit to a polygraph test. See Creadeur v. Department of Public Safety, Division of State Police, 364 So.2d 155 (La.App. 1 Cir.1978), and cases cited therein. It logically follows that the appointing authority can consider termination based on the officer's failing the polygraph test. It would be incongruous to then rule that one could not introduce evidence used in helping make the determination to terminate the officer's employment.
Nevertheless, the determination of who is telling the truth is a sacred determination. The polygraph test is merely a tool to assist the fact finder. Fact finders must be wary not to abdicate the responsibility for determining the truth to a machine or to the expert who operates the machine.
Further, I note that in Creadeura case cited by the majoritythe appellate court held that as a general rule a police officer may be required to take a polygraph or similar test where the request is reasonable and bears sound relationship to police work, lawful departmental policy or interdepartmental matters. However, in Creadeur, the court cautioned that the general rule is not unqualified and is subject to the exception that one is not required to submit to an order to take a polygraph test which is unreasonable or when a legitimate reason exists for refusal to obey such an order. Id. at 157. See also, Jackson v. Department of Health and Hospitals, Office for Citizens with Developmental Disabilities, 98-2772, p. 8 (La. App. 1 Cir. 2/18/2000), 752 So.2d 357, 363.
Certainly, in the instant case, the reasonableness criteria noted in Creadeur is satisfied.
I also note that Officer Evans testified and the fact finder had the opportunity to evaluate his credibility.
CALOGERO, Chief Justice, dissents.
The majority's opinion is based on the fallacy that an employer may simply terminate a civil service employee who refuses to submit to a polygraph examination. However, the lower court cases cited by the majority hold that refusal to submit to a polygraph examination may be deemed insubordination justifying dismissal only under certain circumstances. In Creadeur v. Dep't of Public Safety, Div. of State Police, 364 So.2d 155, 157-58 (La.App. 1 Cir.1978), the primary appellate court case relied upon by the majority, the court held that "as a general rule a police officer may be required to take a polygraph or similar test where the request is reasonable and bears sound relationship to police work, lawful departmental policy or interdepartmental matters, but that the rule is not absolute and is subject to the exception of reasonableness under the circumstances of each case." Notably, in Creadeur, which relied on Roux v. New Orleans Police Dep't, 223 So.2d 905 (La.App. 4th Cir. 1969), the appellate court, in determining the reasonableness of the request, was especially impressed with the appointing authority's testimony that the officer was informed when he was asked to submit to the examination that the results thereof would not be used to discharge the officer "or anything like that but to channel the investigation, to show us in what direction we should follow." 364 So.2d at 156. Not only are the results of the polygraph examination being offered by the appointing authority to justify Officer Evans's dismissal in the instant case, the majority also appears to hold today that mere refusal to submit to an examination can justify dismissal in and of itself. Even if that *74 holding were correct, it is one thing to allow an employer to terminate for insubordination a civil service employee who refuses to submit to a polygraph examination, and it is quite another to say that polygraph examination results may be admitted as competent evidence in a judicial or even quasi-judicial proceeding against the employee to justify his dismissal. Because I disagree that the one necessarily follows the other, I respectfully dissent from the majority's holding today.
As the majority notes, the issue in this case is whether the polygraph examination results may be reasonably found to be competent evidence admissible in an administrative proceeding. The fact that an employee may be fired for insubordination under special circumstances for refusing to submit to a polygraph examination does not make polygraph results legally competent evidence. I do not disagree that it might appear incongruous to the casual observer to allow the appointing authority to require an employee to submit to a polygraph examination or else be terminated, but then not allow the results of the examination in evidence at an administrative hearing to justify the decision to dismiss the employee. Yet, the majority concedes that the results of the examination would not be admissible in a criminal trial against the police officer. To my mind, the same reasons for not allowing such evidence in a criminal or civil proceeding militate against allowing such evidence in an administrative proceeding, where, as the majority concedes, lay persons are frequently involved. Ante, p. 67-68.
I find the reasons for disallowing polygraph examination or stress test results in criminal cases to be relevant to the instant case. As the majority notes, in State v. Catanese, 368 So.2d 975 (La.1979), we set forth several policy reasons for not allowing such evidence in criminal trials: (1) the fact-finder would give conclusive weight to the polygraphist's opinion; (2) the reliability of the examination results depends solely on the polygraphist's skill; and (3) no extensive procedural safeguards exist governing the admission of polygraph results. The majority addresses none of these policy considerations specifically; instead, the majority states generally that administrative proceedings should be treated differently than ordinary trials for various reasons and that police officers hold a position of public trust. However, there is no indication here that the proceeding before the Board meets any of the majority's stated conditions for treating evidentiary issues regarding polygraph examinations differently than we treat such issues in ordinary criminal or civil trials. The Board here was merely adjudicating a dispute between the appointing authority and the civil servant, and there is no suggestion that it was composed of non-lawyer members who had any expertise in polygraph results. Elsewhere, the majority, presumably in addressing the Catanese policy reasons, simply concludes that the Board gave proper weight to the polygraph examination results and observes that the licensed polygraphist was extensively cross-examined by counsel, ostensibly establishing the reliability of the witness's interpretation of the polygraph measurements. The fact remains that the Board in this case functioned as any other jury might in determining the credibility of a party and the weight to give the testimonial evidence.
In my view, the court of appeal had it right on a number of points. In this case, the dispute was between the internally-conflicting, self-serving hearsay statements of a convicted killer, one statement of which contained hearsay-within-hearsay of still another convicted murderer, and the testimony of a police officer with no prior disciplinary infractions who denied divulging confidential information to his son *75 or Pickens, and who, in fact, had previously turned his son in to law enforcement authorities on drug charges. As the court of appeal reasonably found, the Board clearly relied on the polygraphist's testimony and his interpretation of the results of his examination of the police officer employee to overcome the weak hearsay evidence against the officer and to justify the appointing authority's decision. The lay board members simply adopted the "lie detector" test results to find that the officer was not credible, thereby giving conclusive weight to "developing and inexact" scientific evidence, a result we explicitly warned against in Catanese.
The court of appeal next pointed out the questionable reliability of polygraph results. As the majority itself notes, the physiological measurements are fairly straightforward and "[i]t is up to the examiner to determine the suitability of the subject for testing, to formulate proper test questions, to establish the necessary rapport with the subject, to detect attempts to mask or create reactions on the chart, and to interpret the charts." Ante, p. 64, n. 1. Although polygraphists might now be licensed and subject to certain professional requirements since our decision in Catanese, the fact remains that the reliability of the test results is entirely dependent upon the skill and the subjective decisions of the examiner, who, as the Supreme Court has recognized, is effectively giving his opinion on the subject's truthfulness or deception on another occasion without any knowledge of the relevant facts. See United States v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). Moreover, as the appellate court observed, the witness's opinion testimony is based on the subject's physiological responses, which have not been scientifically proved to be causally related to truthfulness or deception. See Evans v. DeRidder Municipal Fire and Police Bd., 01-118, pp. 5-6 (La.App. 3 Cir. 6/27/01), 789 So.2d 752, 757-58. Justice Knoll in her concurrence recognizes the science as "developing and inexact." Tellingly, the majority makes no mention of whether the state of the science justifies accepting polygraph results today as reliable evidence in a judicial or quasi-judicial proceeding. Instead, the majority simply notes that the witness was cross-examined as to possible inaccurate test results.
Finally, the majority, as Justice Weimer apparently recognizes in his concurrence, neglects to impose any restrictions or even basic evidentiary guidelines on the admissibility of polygraph test results in civil service proceedings, despite our cautionary language in Catanese. The rationale of Chaisson v. Cajun Bag & Supply Co., 97-1225 (La.3/4/98), 708 So.2d 375, discussed by the majority simply does not provide the "extensive procedural safeguards" we said in Catanese would be necessary for polygraph examination results to be admitted in evidence.
The majority opinion, when it comes down to its essence, simply turns on the facile logic that a civil service employee may be fired for insubordination for refusing to submit to a "lie detector" test, ergo the appointing authority should be able to introduce the results in a civil proceeding to justify a decision to dismiss the employee when the results of that test are negative. In Catanese, we recognized that polygraph examination results might be admissible in a post-trial setting to determine whether a new trial should be granted, that is, in circumstances where the defendant's guilt or innocence is not at issue and the trial judge decides both the admission of the evidence and the weight to give it. I understand our reasoning there to suggest that polygraph examination results might have a role to play in the search for truth, as opposed to simply *76 being the final arbiter on truth or deception. Clearly the Creadeur court recognized as much. Thus, it is not illogical to allow an appointing authority to require under reasonable circumstances that the civil servant submit to a polygraph examination in the authority's search for the truth, i.e., as an investigative tool, yet not permit the subsequent introduction of the negative results of such an examination in a quasi-judicial proceeding to prove that the civil servant was deceptive on a particular occasion, and thus conclusively determine the civil servant's credibility, a role best left to the fact-finder unencumbered by questionably-reliable opinion testimony.
Based on the foregoing reasons, I would affirm the court of appeal's finding that the Board erred in allowing in evidence the testimony of the polygraphist regarding his interpretation of the results of the polygraph examination.
NOTES
[1] This type of polygraph is a machine that records and graphs three or four physical responses. These are galvanic skin response (sweating of the palms), the mean of the systolic and diastolic blood pressures, respiration rate, and sometimes changes in the blood flow in the tip of the index finger. These responses are measured by instruments placed on the subject being tested, and are made visible by simultaneous and continuous recording on a chart. The machine which connects the subject and the chart does not detect deception. Rather, the examiner studies the readings which are interpreted as giving indications of deception. The underlying theory of polygraphy is that conscious effort at deception by a rational individual causes involuntary and uncontrollable physiological responses that include measurable reactions in the bodily functions being monitored. It is up to the examiner to determine the suitability of the subject for testing, to formulate the proper test questions, to establish the necessary rapport with the subject, to detect attempts to mask or create reactions on the chart, and to interpret the charts. Sheila K. Hyatt, Developments in the Law of Scientific Evidence: The Admissibility of Polygraph Evidence, 18 J. NAALJ 171, 179 (Fall, 1998).
[2] The pertinent questions were: (1) "Do you know for sure who, informed on Ernest Prater?" (2) "Did you tell any unauthorized person that Ernest Prater was an informant?" (3) "Did you tell Eric Pickens that Ernest Prater was an informant?" (4) "Did you tell Johnny Evans, Jr. that Ernest Prater was an informant?". Evans answered "No" to each of these questions.
[3] We make no ruling on whether a polygraph is admissible in a civil trial outside the context of an appeal of a Civil Service Board ruling in a Civil Service employee disciplinary proceeding.
[4] The Act prohibits the use of lie detector tests by private employers except under limited circumstances. 29 U.S.C. § 2006(d)-(f). Further, an employer may not discharge, discipline, discriminate, or deny employment or promotion on the basis of an employee's refusal to take a lie detector test. Private employer exemptions to the Polygraph Protection Act include those relating to ongoing investigations, security services, and drug companies.
[5] We also disagree with the court of appeal's reliance on United States v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), in ruling that the polygraph was inadmissible. Scheffer merely upheld the Court of Military Justice's per se statutory rule against the admission of polygraph evidence in court martial proceedings in the face of a defendant's constitutional challenge that such an exclusion violated the right of an accused to present a defense under the Fifth and Sixth Amendments. In fact, the Court in Scheffer noted the vast use of polygraph tests by the government, primarily in the field of personnel screening, and pointed out that these "out of court uses of polygraph techniques obviously differ in character from, and carry less severe consequences than, the use of polygraphs as evidence in criminal trials." 523 U.S. at 312, n. 8, 118 S.Ct. 1261.
[6] On the first inconsistency, the court of appeal reasoned as follows:

Mr. Pickens stated that Johnny did not mention names. Instead, "He [Johnny] said some [people] on Bishop told me that Ernie [Prater] was the one ratting us out." Not only does this underscore a critical inconsistency, but it also demonstrates that there could have been another source for his information other than Patrolman Evans.