995 So.2d 686 (2008)
Philip KRUPP
v.
DEPARTMENT OF FIRE.
No. 2007-CA-1260.
Court of Appeal of Louisiana, Fourth Circuit.
November 19, 2008.
Rehearing Denied December 17, 2008.
*688 James B. Mullaly, Assistant City Attorney, Joseph V. Dirosa, Jr., Chief Deputy City Attorney, Penya Moses-Fields, City Attorney, New Orleans, LA, for City of New Orleans.
Scott W. Smith, Scott W. Smith, L.L.C., Metairie, LA, for Phillip J. Krupp, III.
(Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge Pro Tempore moon LANDRIEU).
MOON LANDRIEU, Judge Pro Tempore.
The appellant, Captain Phillip J. Krupp, III ("Krupp"), appeals an August 1, 2007 decision of the Civil Service Commission, upholding his termination by the Appointing Authority, the City of New Orleans Department of Fire ("NOFD"). We affirm.

FACTS AND PROCEDURAL HISTORY
Krupp was first hired by the NOFD on August 17, 1998, and was promoted to his current class on April 30, 2006. In connection with his employment, Krupp was subject to random drug testing, and on May 1, 2006 submitted to a drug test. Concentra Medical Center ("Concentra") collected Krupp's urine sample, which was delivered to Kroll Laboratory Specialists ("Kroll") for testing. Kroll reported to the Appointing Authority that Krupp had tested positive for benzoylecogonine-cocaine metabolites. After a pre-termination hearing, the Appointing Authority notified Krupp by letter dated July 31, 2006 that he was terminated for violating the NOFD's substance abuse policy. Krupp appealed his termination to the Civil Service Commission.

Civil Service Commission Hearing
A hearing was held before the Civil Service Commission Hearing Examiner on November 16, 2006. Mindy Jackson, an employee of Concentra, testified that she had collected Krupp's urine sample. Ms. Jackson explained that after she gave *689 Krupp a cup, he went into the bathroom, returned a few minutes later, and handed her the cup, which contained urine. Ms. Jackson measured the temperature of the urine to confirm that it was within the acceptable range of 90 to 100 degrees Fahrenheit. According to Ms. Jackson, Concentra required her to measure the temperature to guard against the donor altering or substituting the specimen and, if the urine measured outside the acceptable range, a second urine sample had to be collected under direct supervision.
Ms. Jackson testified that Krupp provided a "cold sample" or one which fell below the acceptable temperature range. As a result, she was required to complete an "Unusual Collection Form" that specified the reason for the unusual collection. Ms. Jackson testified that she recited the information contained on the form to Krupp and obtained his signature, confirming that he understood the reasons why Concentra had to collect a second sample.[1]
Ms. Jackson testified that she then disposed of the first sample, and told Krupp that a second sample was needed. After consuming water and waiting several minutes, Krupp gave a second sample. According to Ms. Jackson, she followed the same procedures with the exception that Francisco Silva, M.D., accompanied Krupp to the bathroom and observed him urinating into the cup. Ms. Jackson testified that Krupp gave her the cup filled with urine, which she poured into collection vials and sealed in his presence. Krupp then initialed the seals to evidence that the he had observed her sealing the specimen vials. Thereafter, Ms. Jackson completed the "Non-Federal Custody and Control Form," stating in the section of the form reserved for remarks, "1st attempt out of range." Although Ms. Jackson's and Krupp's signatures appear on the form, Ms. Jackson acknowledged that she failed to indicate on the form that Dr. Silva had observed the collection of Krupp's second urine sample. Ms. Jackson explained that she followed the procedures for non-federal employees, which did not require that the Substance Abuse and Mental Health Services Administration ("SAMHSA") guidelines be followed. Consequently, she did not retain the cold sample or specifically mention Dr. Silva as an observer.
Patricia Pizzo, Kroll's Director of Toxicology, testified regarding the testing procedures that were followed. She testified that she certified the positive test results for the sample provided by Concentra bearing Krupp's specimen identification number. On cross-examination, Ms. Pizzo acknowledged that Louisiana required collection sites to follow the SAMHSA guidelines in obtaining specimens from Louisiana residents for drug testing purposes.[2] *690 She confirmed that SAMHSA guidelines instruct the collector to retain the cold sample as well as the second collected sample and to specifically name the observer of the second collection in the remarks section of the custody and control form, neither of which was done in this case.
Krupp confirmed that Ms. Jackson had collected his urine sample. However, contrary to her testimony, Krupp testified that Ms. Jackson had completed the paperwork before he gave his initial sample. He claimed that after giving his first sample, Ms. Jackson made a derogatory remark, told him that he did not provide enough and would have to give a second sample. Krupp acknowledged that he had signed the Unusual Collection Form, but claimed that Ms. Jackson never read or explained the form to him. Krupp also acknowledged that Dr. Silva had observed him giving the second sample. He contends that Dr. Silva took the second sample from him and then he left the collection facility without seeing what Ms. Jackson and Dr. Silva did with the sample. Krupp stated that he did not observe Ms. Jackson pour the urine sample into the specimen vials nor seal the vials with the labels containing his initials. Although he claimed that he had initialed the labels prior to giving his first sample, Krupp acknowledged that, at previous drug tests, he always initialed the labels after observing the collector seal the vials.
Krupp offered the testimony of Patricia M. Williams, Ph.D., a board certified toxicologist, who testified as an expert in specimen collection procedures. Dr. Williams testified that Ms. Jackson did not comply with the SAMHSA guidelines in collecting Krupp's urine specimen, as the second chain of custody form was invalid. According to Dr. Williams, the form submitted by Ms. Jackson was, in fact, the form for the initial, discarded specimen, and improper for use with the second specimen. She also noted that Ms. Jackson had failed to name Dr. Silva as the observer for the second collected specimen on the chain of custody form.
While the hearing examiner found Ms. Jackson to be credible, he concluded Krupp was untruthful and evasive. He determined that Krupp had tried to alter the first urine sample because Krupp knew he would test positive for cocaine metabolites, and, as a consequence, the sample was below the temperature standards. The hearing examiner concluded that Ms. Jackson had discarded the initial specimen because she did not believe the SAMHSA guidelines applied to the collection of specimens from city employees, and not because of any animus toward Krupp. The hearing examiner determined that Ms. Jackson had informed Krupp that a second sample was required for the reasons stated in the Unusual Collection Form and that Krupp signed the form with full knowledge and understanding. He found that Krupp had observed Ms. Jackson pour the second sample into vials and seal the vials *691 in his presence. The hearing examiner further found that Krupp had placed his initials over the sealed vials, which were still intact when they arrived at the Kroll laboratory.
As to Dr. Williams, the hearing examiner concluded that her expertise did not qualify her to offer legal conclusions regarding the impact of the collection site's failure to follow certain SAMHSA guidelines. He determined that neither Concentra's failure to retain the cold sample with the chain of custody documentation nor its failure to name Dr. Silva in the custody and control form was a fatal flaw in the chain of custody. Any concerns regarding the accuracy of the testing procedures, the hearing examiner found, were addressed by the credible testimony of both Ms. Jackson and Mr. Pizzo. Finally, the hearing examiner determined that the second urine sample provided by Krupp did, in fact, test positive for cocaine metabolites, providing legal cause for his termination by the NOFD.
The Civil Service Commission adopted the hearing examiner's findings and upheld Krupp's termination.
This appeal followed.

STANDARD OF REVIEW
An employee who has gained permanent status in the classified city civil service cannot be subjected to disciplinary action by his/her employer except for cause expressed in writing. La. Const. art. X, § 8(A); Walters v. Department of Police, 454 So.2d 106 (La.1984). The employee may appeal from such disciplinary action to the City Civil Service Commission, and the burden of proof on appeal, as to the facts, is on the appointing authority. Id.; Goins v. Department of Police, 570 So.2d 93 (La.App. 4th Cir.1990).
"Cause" for the dismissal of a person who has gained permanent status in the classified civil service has been interpreted to include conduct prejudicial to the public service in which the employee in question is engaged or detrimental to its efficient operation. Walters v. Department of Police, 454 So.2d. at 113. The Civil Service Commission has a duty to decide independently from the facts presented whether the appointing authority has good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed was commensurate with the dereliction. Id.
The Civil Service Commission's decision is subject to review on any question of law or fact upon appeal to the appropriate court of appeal. La. Const. art. X, § 12(B). Thus, the reviewing court should apply the clearly wrong or manifest error rule prescribed generally for appellate review in deciding whether to affirm the Civil Service Commission's factual findings. Walters v. Department of Police, 454 So.2d. at 113; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In reviewing the Civil Service Commission's findings of fact, the court should not reverse or modify such a finding unless it is clearly wrong or manifestly erroneous. In judging the Civil Service Commission's exercise of its discretion in determining whether the disciplinary action is based on legal cause and the punishment is commensurate with the infraction, the court should not modify the commission's order unless it is arbitrary, capricious or characterized by an abuse of discretion. Id. at 112-14; See also Evans v. DeRidder Municipal Fire and Police Civil Service Board, 2001-2466 (La.4/3/02), 815 So.2d 61; Delpit v. New Orleans Dept. of Utilities, 2002-2008 (La.App. 4 Cir. 2/19/03), 841 So.2d 30.
*692 In Newman v. Department of Fire, 425 So.2d 753 (La.1983), the Louisiana Supreme Court discussed the meaning of arbitrary and capricious in the context of a civil service commission hearing as well as the legal cause necessary to impose disciplinary action on a civil service employee. The Supreme Court stated:
Disciplinary action against a civil service employee will be deemed arbitrary and capricious unless there is a real and substantial relationship between the improper conduct and the "efficient operation" of the public service. The appointing authority (Superintendent) must demonstrate, by a preponderance of the evidence, that the conduct did in fact impair the efficiency and orderly operation of the public service.
Id. at 754.
In Bannister v. Department of Streets, 95-0404 (La.1/6/96), 666 So.2d 641. the Louisiana Supreme Court again considered the meaning of "arbitrary and capricious" in the context of a Civil Service Commission hearing and determined that "arbitrary and capricious" means that there is no rational basis for the action taken.

DISCUSSION
On appeal, Krupp argues that the Civil Service Commission erred by upholding his termination based on the positive drug test results where the specimen collection procedure was fatally flawed because Concentra did not follow SAMHSA guidelines, as required by La. R.S. 49:1005, and the NOFD failed to produce a witness to establish the chain of custody of his second urine sample. Specifically, he contends that Concentra's collection the second urine sample did not comply with SAMHSA guidelines in three ways: (1) Ms. Jackson failed to submit the initial cold sample to Kroll for testing; (2) Ms. Jackson failed to submit a separate chain of custody form with the first specimen, and, therefore, the chain of custody form included with the second specimen was invalid, and (3) Ms. Jackson failed to name Dr. Silva as the observer of the second collected specimen on the chain of custody form. These three irregularities, Krupp argues, compromised the chain of custody of the second urine specimen, and, consequently, invalidated the positive drug test results.
In a case where the only evidence against an employee is the positive result of a drug test and no corroborating evidence of substance abuse exists, the chain of custody becomes the critical issue and must be proven by the appointing authority with great care. Blappert v. Department of Police, 94-1284, p. 5 (La.App. 4 Cir. 12/15/94), 647 So.2d 1339, 1343. "To satisfy this standard, `[t]he party seeking to introduce test results must first lay a proper foundation by connecting the specimen with its source, showing that it was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested.'" Id., quoting George v. Department of Fire, 93-2421, p. 13 (La.App. 4 Cir. 5/17/94) 637 So.2d 1097, 1106.
After reviewing the testimony and evidence in the record, we find the NOFD established a valid chain of custody of the urine sample obtained from Krupp for testing purposes. We agree with the Civil Service Commission's finding that Ms. Jackson's failure to follow the SAMHSA guidelines in collecting Krupp's urine specimen was not enough to invalidate the positive drug test results. The cold sample, which was discarded, fell below the necessary temperature range and, thus, could not be used for testing purposes. However, as pointed out by the Civil Service Commission, the first sample *693 was not exculpatory, and its retention served no purpose.
Regarding the custody and control form, it is undisputed that Ms. Jackson completed only one form while collecting both specimens from Krupp, and sent the form with the second specimen to Kroll for testing. Ms. Pizzo testified that she approved the positive test results because she was able to verify that the specimen identification number on the chain of custody form signed by Ms. Jackson and Ms. Krupp clearly matched the specimen identification numbers on the urine specimen vials bearing Krupp's name and initials. She also testified that she was able to verify which Kroll employees handled the specimen vials from the time they arrived at the Kroll laboratory from Concentra through the completion of the drug testing procedure. According to Ms. Pizzo, the chain of custody was properly completed in this case.
Furthermore, considering Ms. Pizzo's testimony along with Ms. Jackson's explanation that she did not name Dr. Silva as the observer of the second sample on the custody and control form because she was not aware that the SAMHSA guidelines applied to the collection of urine specimens for the drug testing of a non-federal employee such as Krupp, we agree with the Civil Service Commission's finding that Ms. Jackson's failure to do so was not fatal to the chain of custody.
Finally, Krupp argues that the Civil Service Commission acted arbitrarily, capriciously and contrary to the law by upholding his termination from the NOFD. We disagree.
The evidence in this case supports the Civil Service Commission's finding that Krupp was untruthful and attempted to alter the first urine sample to avoid a positive drug test result. The positive results from the urine sample, evidencing Krupp's recent use of cocaine, clearly provided the Superintendent of the NOFD with cause to terminate Krupp. Thus, we find that the decision of the Civil Service Commission was based on legal cause and was neither arbitrary, capricious, nor an abuse of discretion.

CONCLUSION
For the foregoing reasons, we affirm the decision of the Civil Service Commission that upheld the termination of Captain Krupp from the NOFD.
AFFIRMED.
NOTES
[1] The Unusual Collection Form provided:

Specimen Temperature Out of Range
I understand that the first specimen I attempted to provide was not within acceptable temperature range. I have been advised of the rules and instructions at the top of this page. A same gender collector will immediately collect a second urine sample under direct observation.
[2] La. R.S. 49:1005, provides:

A. All drug testing of individuals in residence in the state and all drug testing of samples collected in the state, including territorial waters and any other location to which the laws of Louisiana are applicable, shall be performed in SAMHSA-certified or CAP-FUDT-certified laboratories, if both of the following apply:
(1) If, as a result of such testing, mandatory or discretionary negative employment consequences will be rendered to the individual.
(2) Drug testing is performed for any or all of the following classes of drugs: marijuana, opioids, cocaine, amphetamines, and phencyclidine.
B. Drug testing as provided in the Subsection shall be performed in compliance with the SAMHSA guidelines except as provided in this Chapter or pursuant to statutory or regulatory authority under R.S. 23:1081 et seq. and R.S. 23:1601 et seq. The cut off limits for drug testing shall be in accordance with SAMHSA guidelines with the exception of initial testing for marijuana. The initial cut off level for marijuana shall be no less than fifty nanograms/ML and no more than one hundred nanograms/ML as specified by the employer or the testing entity. The Department of Health and Hospitals shall have the responsibility to adopt the SAMHSA guidelines for purposes of governing drug-testing programs specimens collected in accordance with this Chapter. The Department of Health and Hospitals shall have the responsibility for adoption of any subsequent revisions of the SAMHSA guidelines as of the initial effective date of this Chapter.