CARTER, C.J.
 

 |3In these consolidated cases, Clara Harrell and Brenda Prater were permanent-status civil service employees of the Louisiana Department of Health and Hospitals, Office for Citizens with Developmental Disabilities, at the Pinecrest Supports and Services Center (hereinafter referred to as “Pinecrest”). Ms. Harrell and Ms. Prater appeal an adverse ruling by the State Civil Service Commission (the Commission) upholding their termination by the appointing authority from their previous state employment as Residential Services Specialists at Pinecrest. After a thorough review of the record and the applicable law and jurisprudence, we affirm the Commission’s decision, finding Ms. Harrell’s and Ms. Prater’s terminations were based on legal cause and commensurate with the infractions.
 

 
 *300
 
 BACKGROUND
 

 Prior to their terminations, Clara Harrell and Brenda Prater were both serving in supervisory positions with permanent civil service status, having been employed as Residential Services Specialists (RSS-6 and RSS-5, respectively) on Home 315 at Pinecrest. Pinecrest is a state institution for the care of persons with serious mental and physical disabilities, and Home 315 is an assisted living facility for special needs residents at Pinecrest, many of whom are nonverbal.
 
 [1]
 
 After written notice, Ms. Harrell and Ms. Prater were terminated for cause on September 26, 2008. They were charged with physically, emotionally, and psychologically abusing Pinecrest |4Home 315 residents in a variety of specifically outlined ways. The main allegations of abuse involved the use of two-pound hand weights placed in the day hall, the bathroom, and on Ms. Harrell’s desk in June, July, and August 2008. Allegedly, Ms. Harrell and Ms. Prater hit several residents in the knees with the hand weights in an attempt to stop residents from “acting out,” and they instructed subordinate employees to display the hand weights to control the behavior of residents while at Home 315 and on trips away from the Pinecrest facility.
 
 [2]
 

 Ms. Harrell and Ms. Prater each denied all of the charges against them and each requested an appeal of their dismissals to the Commission, alleging that their terminations were in retaliation for their having filed a grievance in June 2008.
 
 [3]
 
 The appeals were consolidated for a three-day public hearing before the Commission’s duly-appointed referee, during which testimony and evidence were presented. The evidence included the written statements of two former Pinecrest employees who did not testify at the hearing and the results of Ms. Harrell’s polygraph test. At the end of the hearing, the matter was taken under advisement; and on September 15, 2009, the referee rendered a decision denying Ms. Harrell’s and Ms. Prater’s appeals. The referee found that Pinecrest had satisfied its burden of proof by proving legal cause for discipline in that Ms. Harrell and Ms. Prater physically, emotionally, and psychologically abused Pinecrest residents. The referee further concluded that the disciplinary action of termination was Incommensurate with the proven infractions involving abuse of the Pinecrest residents whom Ms. Harrell and Ms. Prater were responsible for caring and supporting. Ms. Harrell and Ms. Prater filed an application for review of the referee’s decision, which was denied by the Commission on November 5, 2009. This appeal followed.
 

 ASSIGNMENTS OF ERROR
 

 Ms. Harrell and Ms. Prater assert that the Commission, through its referee, erred when the referee: (1) rejected their appeal since the evidence did not support the conclusion; (2) admitted hearsay statements of former employees; (3) rejected un-rebutted evidence of Ms. Harrell’s poly
 
 *301
 
 graph test; and (4) improperly cross-examined the polygraph expert.
 

 STANDARD OF REVIEW
 

 In civil service disciplinary cases, decisions of the Commission and its referees are subject to the same standard of review as a decision of a district court.
 
 Lasserre v. Louisiana Public Service Com’n,
 
 04-0615 (La.App. 1 Cir. 4/8/05), 903 So.2d 474, 477. Factual findings of the Commission referee are subject to the clearly wrong or manifest error standard of review.
 
 Bannister v. Department of Streets,
 
 95-0404 (La.1/16/96), 666 So.2d 641, 647. It is the province of the Commission referee to determine the weight to be given to evidence in an administrative hearing.
 
 Evans v. DeRidder Mun. Fire,
 
 01-2466 (La.4/3/02), 815 So.2d 61, 69,
 
 cert. denied,
 
 537 U.S. 1108, 123 S.Ct. 884, 154 L.Ed.2d 779 (2003). As to the determination of whether the disciplinary action is based on legal cause and commensurate with the offense, the Commission’s decision should not be modified unless it is arbitrary, capricious, or characterized by abuse of discretion.
 
 Lasserre,
 
 903 So.2d at 477. An administrative agency’s determination is “capricious” |fiwhen it has no substantial evidence to support it; it is “arbitrary” when the evidence has been disregarded or not given the proper weight.
 
 Marsellus v. Dept. of Public Safety and Corrections,
 
 04-0860 (La.App. 1 Cir. 9/23/05), 923 So.2d 656, 661.
 

 DISCUSSION
 

 A classified employee with permanent status may not be subjected to disciplinary action except for cause expressed in writing. LSA-Const. art. 10, § 8(A). Cause sufficient for the imposition of discipline means conduct that impairs the efficiency of the public service and bears a real and substantial relation to the efficient and orderly operation of the public service in which the employee is engaged.
 
 Wopara v. State Employees’ Group Benefits Program,
 
 02-2641 (La.App. 1 Cir. 7/2/03), 859 So.2d 67, 69. The appointing authority (Pinecrest in this case) must prove by a preponderance of the evidence that the employee’s conduct did, in fact, impair the efficient and orderly operation of the public service.
 
 Id.
 
 A preponderance of the evidence means evidence which is of greater weight than that which is offered in opposition. Proof is sufficient to constitute a preponderance when, taken as a whole, it shows the fact of causation sought to be proved as more probable than not.
 
 Brown v. Dept. of Health & Hospitals Eastern Louisiana Mental Health System,
 
 04-2348 (La.App. 1 Cir. 11/4/05), 917 So.2d 522, 527,
 
 writ denied,
 
 06-0178 (La.4/24/06), 926 So.2d 545.
 

 Pinecrest imposed the sanction of termination based upon the written charge that Ms. Harrell and Ms. Prater had physically, emotionally, and psychologically abused Pi-necrest residents. Ms. Harrell and Ms. Prater deny they were abusive and argue that Pinecrest failed to prove by a 17preponderance of the evidence that they were abusive to Pinecrest residents. Ms. Harrell and Ms. Prater also maintain that their dismissal was due to retaliation because they had filed a grievance against Pinecrest administration. However, the Commission’s referee found that the retaliation theory was not supported by any evidence adduced at the hearing, and the Commission’s referee rejected Ms. Harrell’s and Ms. Prater’s self-serving- testimony denying any abusive conduct. The Commission referee’s comprehensive findings of fact specifically focusing on the abusive actions demonstrated by Ms. Harrell and Ms. Prater included:
 

 [[Image here]]
 

 7. Two-pound hand weights were in the Home 315 day hail, bathroom and on
 
 *302
 
 Ms. Harrell’s desk. These hand weights should have been kept in a locked cabinet, but were not.
 

 8. In approximately June, 2007, Ms. Harrell was talking to her subordinate Kemberly Kidd Freeman, an RSS-2 at Pinecrest. Ms. Harrell picked up a two-pound hand weight that was located to the right of the television in the Home 315 day hall, and Ms. Harrell stated to the effect that, “I’m going to show you how to deal with Pinecrest resident number 5012, when he gets out of hand.”
 

 9. Ms. Freeman understood Ms. Harrell to mean that she harmed resident 5012 with the hand weight. Ms. Freeman walked away as she did not want to hear any more.
 

 * * *
 

 13. After Ms. Harrell, Ms. Prater and Roger Guidry, an RSS-1, went in the Home 315 bathroom with resident number 4303, Ms. Freeman heard resident number 4303 begin to holler repetitively like “Scooby Doo.” The hollering was not a happy sound and was especially unusual as resident number 4303 is nonverbal. Ms. Freeman was not allowed to go into the bathroom.
 

 [[Image here]]
 

 15. Pinecrest staff are obligated to promptly report the abuse of Pinecrest residents.
 

 16. Although Ms. Freeman made reports of abuse, she was reluctant to report abuse involving Ms. Harrell because she had been told she was “out of line,” “to mind her own business,” and that Ms. Harrell was Mike Lienhop’s [a Regional | ^Administrator 4 at Pinecrest] “baby” and that anything said about Ms. Harrell would not be acted on.
 

 [[Image here]]
 

 18. In July, 2008, Mr. Simon, then an RSS-2, walked in on Ms. Harrell and Ms. Prater, who were alone in the Home 315 bathroom with resident number 5012. Both Ms. Harrell and Ms. Prater were actively participating in striking resident number 5012 in the knees with a hand weight. According to Mr. Simon the force of the blows was a 6 on a scale of 1 to 10. At the hearing on June 1, 2009, Mr. Simon could not recall whether Ms. Harrell or Ms. Prater had the hand weight.
 

 19. In July or August, 2008, Mr. Simon saw Ms. Harrell and Ms. Prater standing over resident number 5012, who was seated in his recliner in the Home 315 day hall. A hand weight was visible on a table and resident number 5012 was making defensive gestures with his hands over his knees.
 

 20. In July or August, 2008, Mr. Simon saw Ms. Harrell and Ms. Prater standing by resident number 4377 in the Home 315 day hall. A hand weight was visible on a table. Resident number 4377 was moving his knees and saying “ok.”
 

 21. Ms. Harrell told Mr. Simon that if resident number 5012 acted out, the hand weight would keep him straight.
 

 * * *
 

 23. On August 11, 2008, Mr. Simon gave a statement to Barbara Ashworth, an Adult Protection Specialist 3, with the Office of Aging and Adult Services regarding abuse of Pinecrest residents by Ms. Harrell and Ms. Prater. Initially, Mr. Simon stated that he had seen the hand weights in Ms. Harrell’s and Mrs. Prater’s hands, but he did not know what they intended, that he had not seen the hand weights used for anything other than exercise and that he
 
 *303
 
 had never threatened a client with a weight.
 

 24. As Mr. Simon proceeded with the written statement he provided to Ms. Ashworth he went on to advise that: 1) Renetha Cheatam gave resident number 6029 prune juice that he had heated up, 2) that he had seen Ms. Harrell and Ms. Prater hit residents numbers 5012 and 4377 with the ends of hand weights, that this occurred in the bathroom and day hall, that Ms. Harrell and Ms. Prater were together both times this occurred, 8) that Ms. Harrell and Ms. Prater instructed him to hold up a hand weight to stop residents from acting out, and 4) that he held up a hand weight once to resident number 5012 to stop him from taking the food of another resident.
 

 J|g25. Mr. Simon admitted at the hearing that he lied when he wrote in his statement that he had not seen the hand weights used for anything other than exercise and that he had never threatened a client with a weight.
 

 26. Mr. Simon did not initially report the abuse because he was new to Home 815, both Ms. Harrell and Ms. Prater were his supervisors, and it was his understanding that if you crossed Ms. Harrell you would lose your job.
 

 27. Ms. Harrell and Ms. Prater denied hitting Pinecrest residents with hand weights or telling others to threaten Pi-necrest residents with hand weights. Ms. Harrell further denied giving Pine-crest resident number 6029 an excessive amount of prune juice.
 

 28. On August 7, 2008, Roger Guidry [an RSS-1] provided Ms. Carlisle [an Adult Protection Specialist 3 with the Office of Aging and Adult Services] a written statement wherein he declared:
 

 “I have witnessed Ms. Harrell abuse resident 5012 using a 2 pound hand weight. Ms. Harrell would beat resident 5012 on his knee until he could not stand up, also resident 4,377. The first time I started working on the home I noticed resident 5012 had a couple of huge knots on his knee at which time I informed Ms. Harrell and she responded that it was nothing, he got those from falling down ... Regarding why these incidents were never reported was because Ms. Harrell using her supervisor position never allowed any incidents that happened to the individuals to be reported. Also to stop anyone from noticing these bruises that the individuals received, she always made sure it was done to a lower part of the body where sometimes she would have the employees dress the men in long pants so no one would see their bruises to their knee caps ... I called the Pine-ville Police department to get advice from them at which time I was transferred to a lady who was supposed to handle abuse reports and I informed her regarding the abuse
 
 ...
 
 I was informed that they were going to look into it on Monday August 4, 2008, if not it would be on that Tuesday. I spoke with them on Sunday.”
 

 29.On August 8, 2008, Renetha Chea-tam, an RSS-5 at Pinecrest, provided Ms. Ashworth a written statement wherein she declared:
 

 110‘7
 
 have seen Clara Harrell hit resident number 4377, resident number 5012, and resident number 4303 on the knees with a hand weight, about 3 or 4 times. The first time I became aware of it was about 2 months ago it was 4 or 5 on a scale of 110. The only time I saw it was in group 1 day hall. I have seen Brenda Prater, RSS-5, hit resident 4377, resident 5012 and resident 4303 on the knees 4 or 5 times with a weight about 2
 
 
 *304
 

 months ago it was a í or 5 on a scale of 1-10. A couple of Saturdays ago Ms. Harrell instructed me to give resident number 6029 prune juice before he left to go home.
 

 [[Image here]]
 

 31. Pinecrest resident number 6029 was supposed to receive only two, 4 ounce glasses of prune juice per day.
 

 32. In July, 2008, at Ms. Harrell’s instruction, resident number 6029 was given about 18 ounces of prune juice, prior to his being picked up by his mother, who was taking him to her home for the weekend. Resident number 6029 had a severe bout of diarrhea while in his mother’s care.
 

 [[Image here]]
 

 35. Neither Ms. Carlisle nor Ms. Ash-worth work for Pinecrest. The Office of Aging and Adult Services is independent of Pinecrest.
 

 [[Image here]]
 

 39. On August 6, 2008, Mr. Guidry telephoned Ms. Carlisle and told her that his August 1, 2008 statement [about missing money at Home 315] was not accurate, in that Ms. Cheatam left at 5:30 p.m. on the day in question, not 10 p.m. and Mr. Guidry did not witness Ms. Cheatam count the money in the lock box. Mr. Guidry further advised that he had witnessed abuse of Pinecrest residents.
 

 [[Image here]]
 

 41. Mr. Guidry resigned from Pine-crest, perhaps to avoid disciplinary action.
 

 42. On June 27, 20Ó8, Ms. Harrell and Ms. Prater filed a grievance complaining that Pinecrest was allowing the mother of Pinecrest resident number 6029 to harass them and the Pinecrest staff with her demands, difficult nature, racial prejudice and too frequent contact with Pinecrest staff.
 

 43. Mike Lienhop, Pinecrest’s MRDD Regional Administrator, and David Gill[,] Pinecrest’s Associate Administrator, responded to the grievance.
 

 44. In response to the grievance, resident 6029 was moved from Home 315 to Home 313. In addition, the parents of resident 6029 were advised that they were not to discuss the |nrace or skin color of Pinecrest staff, that race or skin color is never considered in placing staff on any Home and it is inappropriate and a violation of federal law for them to ask that employment decisions be based on these factors.
 

 45. Neither Mr. Lienhop nor Mr. Gill participated in the investigation or the disciplinary actions taken against Ms. Harrell and Ms. Prater.
 

 46. No evidence established that the disciplinary actions were taken against Ms. Harrell and/or Ms. Prater because they filed a grievance.
 

 47. Mr. Guidry's- report of abuse, first to the Pineville Police Department and then to Ms. Carlisle, led to the disciplinary actions taken against Ms. Harrell and Ms. Prater.
 

 (Footnote omitted.)
 

 Additionally, the Commission referee found that during the investigation of the abuse allegations, the Pinecrest residents at Home 315 were examined for evidence of physical abuse, but none was found. And in contrast to Pinecrest’s evidence, Ms. Harrell and Ms. Prater presented the testimony of fifteen other employees that worked in some capacity at Home 315, all of whom declared that they saw no signs of abusive behavior by Ms. Harrell or Ms. Prater toward Pinecrest residents. Be
 
 *305
 
 cause of the conflicting accounts, credibility determinations were paramount to the referee’s factual findings.
 

 After careful review of the record as a whole, we conclude that the factual findings of the Commission’s referee were not manifestly erroneous. We do not re-weigh the evidence, or make our own credibility determinations regarding the witnesses, or substitute our findings for those of the Commission and its referee.
 
 See Louisiana Household Goods Carriers v. Louisiana Public Service Com’n,
 
 99-3184 (La.6/30/00), 762 So.2d 1081, 1085. Our function is to determine whether a reasonable factual basis exists in the record to support the Commission referee’s determination |12that it was more likely than not that the abuse occurred as detailed by Pinecrest. Although two of the eyewitnesses’ testimony was admitted into evidence through written statements given to the investigators, hearsay evidence is admissible in administrative hearings if competent and relevant.
 
 See Chaisson v. Cajun Bag & Supply Co.,
 
 97-1225 (La.3/4/98), 708 So.2d 375, 382. The general rule in administrative hearings is to allow hearsay evidence and to recognize that the inability to cross-examine the de-clarant affects the weight that the evidence carries.
 
 Id.
 

 Moreover,
 
 ex parte
 
 statements are acceptable in a hearing before the Commission or its referee in order to discredit a witness.
 
 See
 
 Civil Service Rule 13.19(g).
 
 [4]
 
 Therefore, the Commission’s referee did not err in admitting the eyewitnesses’ statements into evidence. Ms. Harrell and Ms. Prater denied the charges of abuse, and the written statements of Roger Gui-dry and Renetha Cheatam discredited Ms. Harrell’s and Ms. Prater’s testimony. The statements were certainly relevant to the charges against Ms. Harrell and Ms. Prater because they led to the actual investigation of the abuse. Plus, the statements had some degree of reliability and trustworthiness in that they were offered to investigators that were independent from the appointing authority.
 

 In addition, the testimony of Johnny Simon and Kemberly Freeman directly contradicted Ms. Harrell’s and Ms. Prater’s testimony. The evidence in the record reveals a more than sufficient factual basis to support the factual findings of the referee, which were adopted by the Commission. Specifically, we find reasonable the referee’s decision to credit more weight 11sto the testimony of the independent investigators, as well as the four eyewitnesses that actually performed their jobs involving direct care for Home 315 residents under Ms. Harrell’s and Ms. Prater’s supervision, because they had an opportunity to observe the abuse. Accordingly, the Commission’s referee committed no manifest error and we find no merit to Ms. Harrell’s and Ms. Prater’s first two assignments of error.
 

 Ms. Harrell and Ms. Prater also assert that the Commission’s referee erred in rejecting the un-rebutted testimony of their polygraph expert’s opinion that Ms. Harrell’s denial of the allegations was not deceptive. The referee allowed the introduction of Ms. Harrell’s polygraph test results into evidence through the expert testimony of James D. Kavanaugh, a licensed polygraph operator in Louisiana. Additionally, Ms. Harrell and Ms. Prater complain that the referee erred by improperly cross-examining Mr. Kavanaugh regarding his testing method, study, and peer review of polygraph examinations.
 
 *306
 
 However, we find no merit to either of these arguments.
 

 The Commission referee may examine and cross-examine any witness in any civil service hearing.
 
 See
 
 Civil Service Rule 13.19(h);
 
 Goudeau v. Dept. of Public Safety, Div. of State Police,
 
 349 So.2d 887, 889-890 (La.App. 1 Cir.),
 
 writ denied,
 
 351 So.2d 165 (La.1977). And while the results of a properly administered polygraph examination are admissible under certain conditions in an administrative hearing, the polygraph test is merely a tool to assist the fact finder; it is the Commission referee’s responsibility to determine the weight of the evidence after determining if it is competent and relevant.
 
 See Evans v. DeRidder Mun. Fire,
 
 815 So.2d at 67-68
 
 &
 
 71. We note that contrary to the factual scenario presented in
 
 Evans,
 
 Ms. Harrell 114and Ms. Prater never questioned the admissibility of the polygraph evidence in this case. They offered the evidence to support their position that they did not abuse the Pinecrest residents. Instead, Ms. Harrell and Ms. Prater maintain that the Commission’s referee improperly rejected the expert testimony regarding the polygraph evidence.
 

 It is well settled in Louisiana that the fact finder is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. The fact finder may accept or reject in whole or in part the opinion expressed by an expert.
 
 Harris v. State ex rel. Dept. of Transp. and Development,
 
 07-1566 (La.App. 1 Cir. 11/10/08), 997 So.2d 849, 866,
 
 writ denied,
 
 08-2886 (La.2/6/09), 999 So.2d 785. Furthermore, the fact finder may accept or reject the uncontradicted opinions expressed by an expert as to ultimate facts, based upon the other evidence that is admitted. The effect and weight to be given expert testimony is within the broad discretion of the fact finder, and the decision reached by the fact finder regarding expert testimony will not be disturbed on appeal absent a finding that the trial court abused its discretion.
 
 Louisiana State Bar Ass’n v. Carr and Associates, Inc.,
 
 08-2114 (La.App. 1 Cir. 5/8/09), 15 So.3d 158, 171,
 
 writ denied,
 
 09-1627 (La.10/30/09), 21 So.3d 292. Having thoroughly reviewed the polygraph evidence and the related expert testimony, we find no abuse of the Commission referee’s discretion in declining to assign any weight to the testimony of Mr. Kavanaugh and/or the results of the polygraph test after allowing the evidence to be admitted.
 

 We also note that although the Commission referee failed to make an express finding of detriment to the efficient and orderly operation of the public service for which Ms. Harrell and Ms. Prater were employed (the care |isand supervision of Pinecrest residents), such a finding is clearly implicit in the decision and abundantly reflected in the record.
 
 See Brown,
 
 917 So.2d at 531. Common sense dictates that hitting or threatening nonverbal, mentally and physically-disabled people with hand-weights in order to control their behavior is clearly prejudicial and detrimental to the efficient and orderly operation of the public service that involves the care and support of special-needs residents in an institution specifically designed for that purpose.
 

 A reviewing court should not reverse the Commission’s conclusions as to the existence of legal cause for dismissal and that a punishment is commensurate with the infraction, unless the decision is arbitrary, capricious, or an abuse of discretion.
 
 Sterling v. Dept. of Public Safety & Corrections, Louisiana State Penitentiary,
 
 97-1959, 97-1960, 97-1961 (La.App. 1 Cir. 9/25/98), 723 So.2d 448, 455. The Commission has much discretion in determining the appropriate disciplinary action
 
 *307
 
 when legal cause for such action has been established.
 
 Id.
 
 And even considering the lack of any prior disciplinary history for Ms. Harrell or Ms. Prater, we find that the Commission referee’s decision to uphold their termination was not arbitrary, or capricious, or characterized by abuse of discretion. Once it was established that the physical and emotional abuse took place, the egregiousness of these two supervisors’ abusive conduct while handling the disabled residents entrusted to their care is sufficient grounds to support their terminations. Thus, the record overwhelmingly demonstrates a real and substantial relation between Ms. Harrell’s and Ms. Prater’s abusive actions and the impairment of the efficiency and goals of the public civil service.
 

 | ^CONCLUSION
 

 For the above-outlined reasons, we find the record fully supports a finding of legal cause and the disciplinary action of termination. Therefore, the decision of the State Civil Service Commission terminating Clara Harrell and. Brenda Prater from their permanent positions at Pine-crest Supports and Services Center is hereby affirmed. All costs of these consolidated appeals are equally assessed to Clara Harrell and Brenda Prater.
 

 AFFIRMED.
 

 GAIDRY, J., concurs.
 

 [1]
 

 .Ms. Harrell had supervisory responsibility over Home 315 residents and staff, including Ms. Prater, who managed Home 315 and supervised residents and staff as well. Because of privacy and confidentiality concerns, any reference to Pinecrest residents in this opinion will be by number, rather than by name.
 

 [2]
 

 . Other allegations involved the separate abuse of resident 6029 because of actions taken by the resident’s parent.
 

 [3]
 

 . The grievance was related to the allegedly demanding and inappropriate behavior of the parents of resident 6029 and Pinecrest's administrative response to the parents’ demands.
 

 [4]
 

 . Civil Service Rules have the force and effect of law.
 
 Shelfo v. LHHRA, Pinecrest State School,
 
 361 So.2d 1268, 1271 (La.App. 1 Cir.),
 
 writ denied,
 
 364 So.2d 122 (La.1978).