# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 17-262

NOLVEY STELLY

VERSUS

CITY OF LAFAYETTE, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2015-4786
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**PHYLLIS M. KEATY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**C. Theodore Alpaugh, III**
**Guste, Barnett, Schlesinger, Henderson**
**& Alpaugh, L.L.P.**
**639 Loyola Avenue, Suite 2500**
**New Orleans, Louisiana 70113-7103**
**(504) 529-4141**
**Counsel for Plaintiff/Appellant:**
    Nolvey Stelly

**Michael P. Corry, Sr.**
**J. Daniel Siefker, Jr.**
**Hallie P. Coreil**
**Briney Foret Corry**
**Post Office Drawer 51367**
**Lafayette, Louisiana  70505-1367**
**(337) 237-4070**
**Counsel for Defendant/Appellee:**
    **Lafayette City-Parish Consolidated Government**
    **Lafayette Police Department**

**M. Candice Hattan**
**Attorney at Law**
**Post Office Box 91850**
**Lafayette, Louisiana  70509**
**(337) 234-0431**
**Counsel for Defendant/Appellee:**
    **Lafayette Municipal Fire & Police Civil Service Board**

**KEATY, Judge.**

Nolvey Stelly appeals the trial court's judgment upholding the Lafayette Municipal Fire and Police Civil Service Board's (Board) decision affirming the termination of his employment with the Lafayette Police Department (LPD). For the following reasons, we affirm the trial court's judgment.

## FACTS & PROCEDURAL HISTORY

Stelly, who was employed as a police officer, was terminated by the LPD, a division of the Lafayette City-Parish Consolidated Government (LCG), on December 27, 2013, for violations of company policy. Prior to his termination, three internal affairs investigations were conducted. The first investigation, AD2013-011, occurred after Stelly failed to follow a directive from then-Chief of Police, James Craft. *Stelly v. Lafayette City-Parish Consol. Gov't*, 16-328 (La.App. 3 Cir. 10/12/16), 203 So.3d 531. After the investigation concluded, Stelly was suspended for fifteen days in November 2013. *Id*. Stelly appealed the suspension to the Board, who affirmed the suspension following a hearing in September 2015. *Id*. Stelly appealed the Board's decision to the trial court, which upheld the suspension. This court upheld the suspension on October 12, 2016, following an appeal of the trial court's judgment. *Id*. The facts of investigation AD2013-011 are not at issue in this appeal.

Prior to Stelly's fifteen-day suspension, a pre-determination hearing in AD2013-011 occurred on October 14, 2013. It was alleged that Stelly secretly recorded the hearing, in violation of LPD General Order (G.O.) 201.2, governing professionalism. It was further alleged that Stelly invited news media to cover the hearing, in violation of LPD G.O. 305.1 and LCG Policies and Procedures Manual (PPM) 1200-2. Stelly's purported violations resulted in the commencement of a second investigation, AD2013-014.

Pending the investigation of AD2013-014, Stelly was placed on paid administrative leave, instructed to remain available during regular working hours, and prohibited from working off-duty employment. During this time, LPD discovered Stelly was working at Rick's Towing as a dispatcher. As a result, a third investigation, AD2013-016, commenced and revealed Stelly violated G.O. 201.2, regarding professional conduct; G.O. 204.5, regarding departmental discipline; and G.O. 203.3, regarding non-police related off-duty employment.

At the conclusion of investigations AD2013-014 and AD2013-016, Stelly was terminated on December 27, 2013, with written notice provided on December 30, 2013. Stelly appealed his termination to the Board, which heard the matter on September 9, 2015. Following the hearing, the Board unanimously voted to uphold Stelly's termination. On October 12, 2015, the Board issued a Written Finding of Fact and found the alleged violations occurred. Stelly appealed the Board's decision to the trial court. Following a hearing on October 31, 2016, the trial court affirmed the Board's decision. A written judgment was signed by the trial court on November 14, 2016, and Stelly now appeals to this court.

On appeal, Stelly alleges the following five assignments of error:

1. The ruling of District Court upholding the ruling of the Board was not made in good faith and for just cause as the appointing authority failed to comply with La.R.S. 40:2531(B)(4).

2. The ruling of District Court upholding the ruling of the Board was not made in good faith and for just cause as the conclusions reached and the penalties imposed by the Board were arbitrary, unreasonable[,] and without any basis in fact or law.

3. The ruling of District Court upholding the ruling of the Board was not made in good faith and for just cause as the City of Lafayette and the Lafayette Police Department erroneously found that the alleged actions of [Lieutenant] Stelly violated the provisions of the Lafayette Police Department Standard Operating Procedures.

4.	The ruling of District Court upholding the ruling of the Board was not made in good faith and for just cause as as [sic] the City of Lafayette and the Lafayette Police Department erroneously found that the alleged actions of [Lieutenant] Stelly impaired the efficient operation of the public service.

5.	The ruling of District Court upholding the ruling of the Board was not made in good faith and for just cause as the City of Lafayette and the Lafayette Police Department erroneously imposed discipline that was not commensurate with the alleged infractions.

## LAW & STANDARD OF REVIEW

A civil service employee "may appeal from any decision of the board, or from any action taken by the board . . . that is prejudicial to the employee or appointing authority." La.R.S. 33:2501(E)(1). Such an appeal lies in the trial court wherein the Board is domiciled. *Id.* "This hearing shall be confined to the determination of whether the decision made by the board was made in good faith for cause" and "[n]o appeal to the court shall be taken except upon these grounds." La.R.S. 33:2501(E)(3).

In *Moore v. Ware*, 01-3341, pp. 7-8 (La. 2/25/03), 839 So.2d 940, 945-46 (citations omitted), the supreme court explained the standard of review required for an intermediate appellate court, such as this court, as follows:

> If made in good faith and statutory cause, a decision of the civil service board cannot be disturbed on judicial review. Good faith does not occur if the appointing authority acted arbitrarily or capriciously, or as the result of prejudice or political expediency. Arbitrary or capricious means the lack of a rational basis for the action taken. The district court should accord deference to a civil service board's factual conclusions and must not overturn them unless they are manifestly erroneous. Likewise, the intermediate appellate court and our review of a civil service board's findings of fact are limited. Those findings are entitled to the same weight as findings of fact made by a trial court and are not to be overturned in the absence of manifest error.

The supreme court in *Shields v. City of Shreveport*, 579 So.2d 961, 964 (La.1991) (citations omitted), elaborated on what constitutes good faith as follows: "The dismissal of a police officer does not occur 'in good faith' if the appointing

3

authority acted arbitrarily or capriciously, or as the result of prejudice or political expediency. 'Arbitrary or capricious' means the lack of a rational basis for the action taken."

This court, in *Hewitt v. Lafayette Municipal Fire & Police Civil Service Board*, 13-1429, pp. 4-5 (La.App. 3 Cir. 6/4/14), 139 So.3d 1213, 1217, further explained:

> Legal cause is also required for disciplinary action against a civil service employee. *Martin v. City of St. Martinville*, 321 So.2d 532 (La.App. 3 Cir.1975), *writ denied*, 325 So.2d 273 (La.1976); *Leggett v. Nw. State Coll.*, 242 La. 927, 140 So.2d 5 (1962). "Legal cause for disciplinary action exists if the facts found by the commission disclose that the conduct of the employee impairs the efficiency of the public service." *Leggett*, 140 So.2d at 9. A real and substantial relationship must be maintained "between the conduct of the employee and the efficient operation of the public service; otherwise legal cause" fails to exist and "any disciplinary action by the commission is arbitrary and capricious." *Id*. at 9-10. The action taken by the appointing authority "must be set aside if it was not taken 'for cause,' even though it may have been taken in good faith." *Martin*, 321 So.2d at 535.
>
> "The [a]ppointing [a]uthority has the burden of proving by a preponderance of the evidence the occurrence of the complained of activity and that the conduct complained of impaired the efficiency of the public service." *Fernandez v. New Orleans Fire Dep't*, 01-436, p. 4 (La.App. 4 Cir. 2/6/02), 809 So.2d 1163, 1165. A classified employee has a property right in his employment which he cannot be deprived of without legal cause and due process. *Moore*, 839 So.2d 940.

**DISCUSSION**

**I.      Good Faith & Cause**

In his assignments of error, Stelly contends the trial court's upholding of the Board's ruling was not made in good faith and for just cause. He alleges the Board's conclusions were arbitrary, unreasonable, and without any factual or legal basis. Stelly argues the LPD and the Board erroneously found his alleged actions violated the LPD's operating procedures and impaired the operation of the public

4

service. He contends the LPD and the Board erroneously imposed discipline that was not commensurate with the alleged infractions.

As a civil service employee, Stelly is subject to La.R.S. 33:2500, which provides, in pertinent part:

> A. . . . [T]he appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons:
>
> (1) Unwillingness or failure to perform the duties of his position in a satisfactory manner.
>
> (2) The deliberate omission of any act that it was his duty to perform.
>
> (3) The commission or omission of any act to the prejudice of the departmental service or contrary to the public interest or policy.
>
> (4) Insubordination.
>
> (5) Conduct of a discourteous or wantonly offensive nature toward the public, any municipal officer or employee; and, any dishonest, disgraceful, or immoral conduct.

In a unanimous decision, the Board upheld the LPD's termination. In the Board's Written Finding of Fact, it noted the following:

1.  [Lieutenant] Stelly contacted the media regarding his pre-disciplinary hearing although he was not authorized to do so. This is considered a violation of G.O. 305.1 and PPM 1200-2.

2.  [Lieutenant] Stelly did not complete off-duty employment request forms for Rick's Towing, which is in opposition to G.O. 203.3.

3.  [Lieutenant] Stelly engaged in off-duty employment at Rick's Towing while on administrative leave. This action is considered to be in violation of G.O. 201.2, G.O. 203.3, G.O. 204.5, and PPM 2161-2.

The LPD General Orders provide in pertinent part:

G.O. 305.1: **PUBLIC INFORMATION AND MEDIA RELATIONS**

. . . .

**PUBLIC INFORMATION OFFICE**

A.     All requests for information from the news media, as well as from the public, shall be channeled through the Public Information Office. This office will be responsible for the daily dissemination of information to the news media. (CALEA-54.1.1b)

B.     Except as specified in this Order, no one shall be authorized to release information to the news media.

**GUIDELINES FOR THE RELEASE OF INFORMATION (CALEA - 54.l.ld)**

. . . .

B.     The following information shall not be released to the media:

     1.     Any personal opinion, unsubstantiated fact or rumor concerning any evidence, suspect, crime, event or situation.

**CONFIDENTIAL INVESTIGATIONS (CALEA-54.1.1e)**

A.     Media requests for information pertaining to Internal Affairs Investigation shall be directed to the Chief of Police.

The LCG PPM 1200-2, entitled "**PUBLIC STATEMENTS/NEWS RELEASES**," provides in pertinent part:

**Policy**

In order to represent the best interest of Lafayette Consolidated Government (LCG), employees shall adhere to the following guidelines in disseminating information about LCG operations.

**Procedure**

1.     Any employee who is requested or required to make a public presentation about a matter pertaining to LCG business shall first discuss the content and form of the presentation with the Department Director.

. . . .

8.     Employees shall direct all media requests for comment or information about matters pertaining to LCG to the Department Director, CAO, or City-Parish President.

Lafayette Police Department G.O. 203.3, entitled "**OFF-DUTY POLICE RELATED & NON-POLICE RELATED EMPLOYMENT**," provides in pertinent part:

**NON-POLICE RELATED OFF-DUTY EMPLOYMENT (CALEA-22.3.4)**

A.     Non-police related off-duty employment is defined as limited employment, which is not law enforcement related and is beyond the scope of employment of the Lafayette Police Department.  Examples of non-law enforcement related employment include, but are not limited to, ownership of non-law enforcement related business and salesclerk in a retail store. Non-police related off-duty employment is not an off-duty detail.  All requests pertaining to this form of employment must be submitted via the authorized "Request for Off-Duty Employment" form.

Lafayette Police Department G.O. 201.2, entitled "**PROFESSIONAL CONDUCT AND RESPONSIBLITIES**," provides in pertinent part:

**PURPOSE**

This Order establishes standards regarding professional conduct and general responsibilities required of each employee.

. . . .

**PROFESSIONAL CONDUCT (GALEA-26.1.1)**

. . . .

I.     Employees shall not criticize or ridicule the Department or its policies, LCG officials, or other employees by speech, writing, email, MDT transmission, police radio, or other expression. This includes, but is not limited to, expressions which are defamatory, obscene, unlawful, undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for the truth and/or malice.

. . . .

7

## CLANDESTINE RECORDINGS

A.  It shall be the policy of the Lafayette Police Department to prohibit clandestine recordings of members of the Department unless such activities are authorized by the Chief of Police.

. . . .

B.  In an effort to prevent unauthorized conduct and to ensure the integrity of the Lafayette Police Department, clandestine recordings of members of the Department by another member is strictly prohibited unless specifically authorized by the Chief of Police and in accordance with applicable Federal and State law.

. . . .

G.  Violations:

　　1.  Violations of this Written Directive shall be classified as a **Category 3 Administrative Offense** which is subject to disciplinary action, leading up to, and inclusive of termination.

　　. . . .

## RESPONSIBILITIES

. . . .

C.  Employees shall abide by all Federal, State, and Local Ordinances, as well as, LCG PPM's, Department Written Directives, General Orders, Standard Operating Procedures, and rules of the Civil Service Board.

D.  Employees shall promptly obey all lawful orders issued by supervisors, in addition to promptly follow the directions of radio dispatchers.

　　1.  The failure or deliberate refusal of employees to obey such orders shall be deemed as insubordination and is prohibited.

　　2.  Flaunting with the authority of a supervisor by displaying obvious disrespect or by disputing his/her orders shall likewise be deemed as insubordination and subject to progressive disciplinary action.

## ATTENTION TO DUTY

. . . .

B.     All employees, within the scope of their responsibilities, shall abide by LCG Policies and Procedures, in addition to all Lafayette Police Department Written Directives. Employees shall report any violation to their immediate supervisors without delay. When possible, they will actively prevent such violation or interrupt/intervene as necessary to ensure professional and proficient operation.

C.     Employees, whether on or off duty, shall follow the ordinary and reasonable rules of good conduct and behavior. They shall not commit any act in an official or private capacity that would bring reproach, discredit, or embarrassment to their profession, the Department, or which could constitute conduct unbecoming by an employee. Employees shall follow established procedures in carrying out their duties, and shall at all times use sound judgement.

Lafayette Police Department G.O. 204.5, entitled "**DEPARTMENTAL DISCIPLINE**," provides in pertinent part:

## 3:0    <u>CATEGORY 3 OFFENSES</u>

. . . .

### 3.17   Carrying Out Orders

Employees of the Department are required to obey any Standing Order or General Order, abide by all policies and procedures and promptly carry out any order relayed from a supervisor by an employee of the same or lesser rank, whether issued verbally, in writing, or by telecommunications (2-way radio, phone, fax, digital communications). Employees shall obey lawful order(s) of a superior. Upon receipt of a conflicting order, the employee receiving the order shall tell the supervisor issuing the second order of this fact. If then directed, the employee shall obey the second order. Upon receipt of a perceived unjust or improper order, the receiving employee shall obey the order to the best of his ability within the limits of law, and then report the order through proper chain of command. No employee shall obey an order that is contrary to Federal, State, or City Law.

### 3:18   Insubordination

Employees shall promptly obey all lawful orders and directions given by supervisors. The failure or deliberate refusal of employees to obey such orders shall be deemed insubordination and is prohibited. Flaunting with authority of a superior officer by displaying obvious disrespect or by disputing his orders shall likewise be deemed insubordination.

Lafayette Consolidated Government PPM 2161-2, entitled "**CONDITIONS OF EMPLOYMENT**," provides in pertinent part:

1. **Requirements**

. . . .

1.6     To be at your assigned work place and ready for work at the designated starting time.

. . . .

1.18   To follow instructions of your supervisor and perform tasks as directed.  If you consider an order improper or unjust, perform the task and request permission to bring the matter to your supervisor's superior, unless the task would clearly jeopardize your health and safety, or violate policy.  In such case, talk it over with your supervisor immediately.  If the task is clearly unsafe or overly dangerous, you have the right to demand that your supervisor contact the Safety Officer for an onsite consultation.  Failure to obey instructions is a serious offense; therefore, you may be asked to state your reasons in writing.

. . . .

2. **Prohibitions**

. . . .

2.9     Insubordination resulting from refusing or failing to comply with a lawful directive given by a supervisor or superior. Depending upon the facts and circumstances of the insubordination, the actions of the employee may be deemed to be so extreme, outrageous, and unacceptable so as to constitute "gross insubordination" and a major offense as defined under Section 3.2 of this PPM.

. . . .

3. **Classification of Offenses**

. . . .

3.2     **Major Offenses** are those willful or deliberate violations that exceed those considered correctable by progressive, corrective disciplinary action and which may result in immediate discharge without consideration of employment history or past performance.  Major offenses include the following:

10

. . . .

d. Gross insubordination, consisting of a repeated refusal or failure to comply with a lawful directive given by a supervisor or superior after having been warned of the potential consequences of such actions (Section 1.18, 2.4 and 2.9 of this PPM).

The Board further concluded the following:

The evidence and testimony presented to the Lafayette Municipal Fire and Police Civil Service Board established that the alleged violations did occur. The Board determined that the Appointing Authority acted in good faith for cause in the disciplinary action taken against [Lieutenant] Nolvey Stelly and thereby upholds the action of the Appointing Authority.

The Board's termination was upheld by the trial court, who stated the following at the conclusion of oral argument: "I found no factual basis for . . . overturning the firing." In its subsequent written judgment, the trial court found the "Board acted in good faith and for cause in upholding the termination."

A. *Media*

The Board's decision was based upon the evidence submitted at the hearing, including e-mail correspondence received by Officer Paul Mouton from Linda Meaux of the Acadiana Gazette, a local newspaper. In the October 15, 2013 e-mail, Meaux stated the following:

Ireceived [sic] a request by [Lieutenant] Nolvey Stelly that we publish information regarding his October 21, 2013 disciplinary hearing with Chief Craft.

Please send me a press release, Freedom of Information, is [sic] whatever action taken on case, related to his being medically released as fit for duty, or does it stem from alleged civil rights, Kane Marceaux suit.

The investigative report in the record reveals that Detectives Shawn Terro and Patrick Pattum obtained Detective Ron Clark's recorded statement on October 24, 2013. Detective Clark revealed in that statement that he was present at Stelly's pre-disciplinary hearing for the purpose of recording it. Detective Clark

11

explained that prior to activating his recorder, he placed it on the table and asked if the others were ready for him to start recording. Detective Clark advised that Chief Craft told him to wait while he asked everyone in the room if anyone was recording. According to Detective Clark, at that point, Stelly revealed he was recording. Chief Craft subsequently told Stelly to put his recording device on the table, at which point Stelly retrieved his cellular phone and placed it on the table. Detective Clark explained that, prior to Chief Craft's question, Stelly failed to notify anyone in the room that he was recording. When Stelly placed his cell phone on the table, Detective Clark did not witness Stelly press any buttons which would stop or start his phone recording.

Meaux also provided a recorded statement to Detective Terro. Therein, Meaux revealed that she is an artist and a reporter for a local newspaper. Meaux further indicated that Stelly went to her home to retrieve a picture she had painted of his son whereupon he asked whether she was still a reporter. When Meaux indicated that she was, Stelly revealed that he had an upcoming hearing in front of Chief Craft. According to Meaux's statement, Stelly explained he may be terminated and asked Meaux to go to the police station during his hearing.

Stelly provided a taped statement to Detective Terro and Sergeant Chastity Arwood on December 2, 2013. That statement revealed that Stelly agreed he contacted Meaux regarding his son's portrait, which was a non-police-related matter. When asked whether he gave her any information regarding the pre-disciplinary hearing, he responded: "Uh no she . . . notice[d] that I worked at the police department. . . . [W]e had a conversation. I told her . . . I was one of the officers in the federal law suit, but that I couldn't talk about it." Stelly further explained: "[S]he asked if . . . there was any retaliation for the lawsuit[,] and I told her that I was receiving discipline . . . and that I had a hearing coming up and . . . if

12

she needed to know anything more than that she needed to contact the police department." Stelly explained he was unaware that he and Meaux would have the foregoing conversation because he went there to retrieve a portrait. Stelly revealed he did not seek prior approval from Officer Mouton or Chief Craft to discuss police-related matters. Stelly opined he did not need prior approval to discuss his job status. Stelly revealed he never asked Meaux to publish any information regarding his pre-disciplinary hearing.

Stelly agreed he "made contact with" one media source regarding his pre-disciplinary hearing. This occurred, according to Stelly, at City Hall prior to his hearing when he saw a cameraman with a local television news station. Stelly indicated that he asked the cameraman if he was going to cover the hearing. According to Stelly, the cameraman responded, "No." Stelly revealed the foregoing was his only encounter with the media. Stelly agreed that the same local news station subsequently appeared in the LPD lobby during his pre-disciplinary hearing.

Stelly acknowledged that he recorded the pre-disciplinary hearing by retrieving his recording device when Detective Clark began setting up his equipment. Stelly believed he could record the hearing since Detective Clark was also recording it. Stelly stated that he did not obtain prior authorization to record from Chief Craft because of a General Order which granted the right to record disciplinary hearings. Stelly advised that he did not notify anyone in the room that he was recording because he did not feel that he had to and he "didn't start recording until [Chief Craft] told me to pull it out my pocket." Stelly indicated Chief Craft gave him permission to record when Chief Craft asked everyone in the room if anyone was recording. Stelly responded by stating: "I'm recording, he's recording." Stelly explained: "[Chief Craft] said well let's put them all on the

desk and let's record and that's what I did." Stelly stated he began recording when he put his phone on the desk.

On December 2, 2013, Detective Terro and Sergeant Arwood obtained a taped statement from Major Terry Head. In his statement, Major Head advised that he was at Stelly's hearing in his capacity as the facilitator. Major Head explained that, "[a]s Stelly was walking into the Chief's hallway, I observed him take his cell phone out of his pocket and press a button on top of it. At that time[,] I turned to Chief Craft and I told him I think [Stelly] is recording . . . he turned on his cell phone recorder." He explained that Stelly walked into the pre-disciplinary hearing as Major Head began reading the opening statement. It was at that point that Chief Craft stopped Major Head and asked if anyone was recording. According to Major Head, Stelly answered, "Yes." Major Head explained that Chief Craft told Stelly to remove the recording device from his pocket and "put it on the table so you can get a good recording. And at that point in time we continued the meeting." When asked whether Stelly activated his phone once he put it on the table, Major Head responded: "Oh no, once [Stelly] took it out of his pocket[,] he just put it on the table and never touched it until he left." Major Head also agreed that there were media sources present on the day of Stelly's pre-disciplinary hearing.

On December 11, 2013, Detective Terro and Sergeant Arwood obtained a taped statement from Captain Ron Czajkowski. Captain Czajkowski explained in his statement that his office is located near Chief Craft's office. He advised that on the day of Stelly's pre-disciplinary hearing, Captain Czajkowski observed Stelly walking towards Chief Craft's office "with his cell phone in his right hand[,] and he was manipulating the phone with one hand." Detective Czajkowski opined Stelly "was activating his cell phone to begin an audio recording." Detective

14

Czajkowski revealed that Stelly "had a history of recording many conversations that he's had with me. And it seems to be a common practice of his."

The Board's finding is supported by the evidence that Stelly violated LPD policies and procedures by contacting the media, i.e., Meaux and the local television news station, as well as by making a clandestine recording of the pre-disciplinary hearing prior to Chief Craft's question regarding the recording of the proceedings. As such, the Board's decision was made in good faith and for cause. Accordingly, the trial court did not manifestly err in upholding the Board's decision.

**B.** *Rick's Towing*

Stelly was placed on paid administrative leave pending the investigation of AD2013-14 pursuant to an October 15, 2013 memorandum notice. The notice provides two conditions Stelly was required to adhere to during the pendency of the investigation: He was prohibited from performing any off-duty employment, and he had to remain available during regular working hours. Stelly's violations of the two conditions resulted in the commencement of investigation AD2013-016 on October 29, 2013, according to another memorandum in the record.

The record contains the investigative report in AD2013-016, which reveals that Detectives Pattum and Clark observed Stelly's car parked in front of Rick's Towing on October 25, 28, 29, 30, and 31, 2013, and on November 1, 2013. Surveillance photographs confirming the foregoing are attached to the report as evidence in the record. The report notes that Stelly did not submit a request for off-duty work, which is in violation of G.O. 203.3, governing off-duty police related and non-police related employment.

The report references a covert telephone call placed to Stelly on October 28, 2013, while he was at Rick's towing. The audio recording reveals that Stelly

15

answered the telephone call, identified himself as Stelly with Rick's Towing, and provided the caller with towing prices. The report also references a video recording made of Stelly while he was at Rick's Towing on November 1, 2013. In the video, Stelly is sitting at a desk, helping a customer, and providing an estimated cost of towing a vehicle. The video shows a customer asking Stelly whether Rick's Towing sold automobile parts, and his subsequent response wherein he stated: "No, what we do with old cars, we sell them to 'Dien's' on Johnston Street." The video depicts Stelly answering a telephone call by stating, "Good afternoon, Rick's towing." Both the audio compact disc (CD) and digital video disc (DVD) were made a part of the record.

The report shows that two telephone calls were placed by LPD dispatchers to Rick's Towing, requesting a next in-line tow. The CD recording of the two calls was placed in the record and reveals that they occurred on October 30, 2013 and November 1, 2013. Stelly answered the calls both times according to the recording. According to the recording, during the first call, Stelly gathered the towing information, asked questions of the LPD dispatcher, and was heard repeating the tow information as though he was dispatching a tow truck. During the second call, Stelly asked for the location and stated that Rick's Towing was en route to the scene. LPD call logs in the record confirm LPD placed two phone calls to Rick's on those dates.

According to Stelly's December 2, 2013 statement, he confirmed that he spoke to LPD dispatchers once or twice when they called Rick's Towing and requested a next in-line tow. The statement indicates Stelly denied that he was employed by, or received compensation from, Rick's Towing. Stelly explained that another person told him that termination was possible and that he should start looking for a job. Stelly advised that he subsequently went to Rick's Towing to

16

retrieve an employment application in the event he would be terminated. He agreed that while at Rick's Towing, he answered the phone, talked on the radio, and greeted customers. Stelly could not remember whether he answered a phone call and provided information regarding the cost to tow a vehicle. He explained that he volunteered at Rick's Towing for approximately two weeks and learned the business.

A November 14, 2013 letter from Richard Baker, the President of Rick's Towing, was introduced into evidence. Baker advised that Stelly "has never been employed by Rick's Towing" and was "seeking an opportunity for employment if in fact termination would be immanent [sic]." He stated that Stelly observed operations but "never received any compensation."

The December 11, 2013 polygraph results along with a DVD of Stelly's examination were attached to the report and placed in the record. They reveal that Stelly denied working for Rick's Towing while on administrative leave. The report further notes that the examiner, Detective Pattum, "ruled [] Stelly to be **Deceptive**."

We find the above evidence supports the Board's finding that Stelly violated LPD policies and procedures by engaging in off-duty employment at Rick's Towing while on paid administrative leave and failing to complete an off-duty employment request form. As such, the Board's decision was made in good faith and for cause. Accordingly, the trial court did not manifestly err in upholding the Board's decision, and Stelly's assignments of error are without merit in this regard.

## II.    Police Officers' Bill of Rights

Stelly contends the trial court's upholding of the Board's ruling was not made in good faith and for just cause because the appointing authority failed to comply with the police officers' Bill of Rights (POBOR), which is governed by

17

La.R.S. 40:2531-2535. Under the statute, a police officer "shall have the right to be represented by counsel" during questioning. La.R.S. 40:2531(B)(4)(a). Additionally, the police officer's "counsel shall be allowed to offer advice to the . . . officer and make statements on the record regarding any question asked of the . . . officer at any interrogation, interview, or hearing in the course of the investigation." La.R.S. 40:2531(B)(4)(c). Stelly alleges his due process rights under POBOR were violated when his counsel was denied the right to be present during Stelly's polygraph examination.

In Louisiana, the supreme court stated the following with respect to polygraph examinations of police officers:

> Police officers throughout the land are routinely subjected to polygraph tests, in both the pre-employment screening process and in investigatory actions involving official misconduct. In fact, the Employee Polygraph Protection Act of 1988, which generally prohibits private employers from using polygraphs in the workplace, contains an exception for federal, state and local government employees. *See* 29 U.S.C. §§ 2001-2008. Further, Louisiana courts have long recognized that a civil service employee may be ordered to take a polygraph, and that the employee can be suspended or discharged for failing to take a polygraph.

*Evans v. DeRidder Mun. Fire*, 01-2466, p. 6 (La. 4/3/02), 815 So.2d 61, 66-67, *cert. denied*, 02-650 (2003), 537 U.S. 1108, 123 S.Ct. 884 (footnote omitted).

We further note that polygraph tests are conducted under certain conditions: "the subject should be physically rested, sober, and mentally alert; he or she is interviewed privately by the examiner. No person is permitted in the examination room during the test other than the examiner and the subject, and no external distractions or disturbances are tolerated." 14 Am. Jur. Proof of Facts 2d 1 § 2. (Originally published in 1977).

Louisiana law and jurisprudence are silent, however, with respect to whether a police officer's due process rights under POBOR are violated when an attorney is

not allowed to be present in the same room as the police officer examinee during the polygraph examination. In this case, the Board and the trial court rejected Stelly's due process claim. The trial court found that notwithstanding the polygraph test, Stelly had a lawyer present at every stage of the proceeding. It held:

> THE COURT: . . . But if what you're telling me is the only time he didn't have counsel present was during the polygraph, that makes a difference to me.
>
> . . . .
>
> THE COURT: No, but . . . that gets me to where I need. That is the issue in the case, and I deny . . . I find that it is not an absolute right to a lawyer, the polygraph, and I don't believe that's an issue that changes my mind on the firing. The Court denies the request at this time.
>
> . . . .
>
> THE COURT: It was only on that one issue that I think would have cause me a problem if it had been in a general interview. Okay.

The Board's and the trial court's ruling was based upon the testimony and evidence adduced at the September 9, 2015 Board hearing regarding Stelly's appeal of his termination. At the hearing, Stelly testified that he received a direct order to take a polygraph. According to Stelly's testimony, he agreed to take the polygraph because he could have been terminated if he did not. He admitted that before submitting to the polygraph, Stelly reviewed the POBOR and placed a check by a written provision indicating he would give a statement without an attorney present. Stelly revealed he also wrote on the POBOR that he was told his lawyer could not be present during the polygraph. Stelly agreed that he consented to be polygraphed by signing and initialing another document.

A LPD "Consent To Be Polygraphed" was submitted into evidence at the hearing. The document is dated December 11, 2013, signed by Stelly as the examinee, and signed by Detective Pattum as the examiner. Therein, Stelly

19

consented to taking a polygraph examination "voluntarily, without duress[ or] coercion[.]" He acknowledged that he "cannot be forced to take this test by anyone" and that he had "no physical or mental condition which would prevent" him from taking the polygraph.

A POBOR was also submitted into evidence at the hearing. The document is dated December 11, 2013, signed by Stelly, and lists Sergeant Arwood as the reporting party. The POBOR lists the rights afforded to police officers under investigation pursuant to La.R.S. 40:2531. The POBOR states: "The law enforcement officer shall be entitled to the presence of his/her counsel, representative, or both, at the interrogations in connection with the investigation." It reveals Stelly wrote his initials next to the following sentence: "I am willing to give a statement without an attorney and/or representative present." The POBAR contains a notation, written by Stelly, that he was informed no lawyer could be present during the polygraph.

Detective Pattum testified that he administered the polygraph. Detective Pattum further testified that he never told Stelly that he could not have an attorney present during the polygraph examination. Rather, he stated that both he and Sergeant Arwood spoke to Stelly's attorney, Daniel Landry. Detective Pattum explained that he also advised Landry that he was not allowed in the room during Stelly's polygraph. He indicated that he told Landry that he could watch the polygraph from a monitor in a different room during the examination. Detective Pattum explained that he had never administered a polygraph with an attorney present in the same room because it could cause an examinee to become stressed and render the polygraph invalid. Detective Pattum also explained that if an attorney knocked on the door while he was administering a polygraph examination, he would stop and "not go[] through with the polygraph . . . because we're not

20

supposed to have any interruptions." Detective Pattum revealed that prior to taking the polygraph, Stelly never indicated that he did not want to go forward without an attorney present. According to Detective Pattum, Stelly willingly signed the consent and the POBOR. Detective Pattum could not recall whether Stelly requested an attorney prior to undergoing the polygraph.

Chief Craft also testified and explained that an attorney's presence during a polygraph examination could distract the examinee and skew the results. He explained that, "we never allow any attorney to be in the same room, but we always allow attorneys if they want to see the test and hear the questions asked they have, that opportunity to do that in an adjoining room[.]" Chief Craft believed Landry was not present during Stelly's polygraph because Landry knew he could not be in the same room as Stelly.

At the hearing, Landry testified Stelly was requested by Sergeant Arwood to undergo a polygraph examination. Landry stated that Detective Pattum advised that he could be present at the police station, but not in the same room as Stelly, during the examination. Landry explained he was not at the police station during Stelly's examination since he would be unable to make any comments on the record. Landry agreed that only the examiner and examinee are allowed in the same room during a polygraph examination.

In brief, Stelly cites *Miller v. City of Gonzales*, 15-1008 (La.App. 1 Cir. 8/31/16), 202 So.3d 1114, wherein a police officer appealed his termination to the board, trial court, and appellate court. On appeal, Miller alleged the board erred in affirming his termination based upon the following two POBOR violations: (1) he was not allowed to record the questioning during the polygraph in violation of La.R.S. 40:2531(B)(3), which provides that all interrogations shall be recorded in full, and (2) he was denied the assistance of counsel during the polygraph, in

21

violation of La.R.S. 40:2531(B)(4)(a) and (c). The first circuit held that the polygraph examination constituted an interrogation under La.R.S. 40:2531(B)(3). Importantly, and for purposes of this matter, the first circuit never addressed the issue of whether Miller's denial of the assistance of counsel during the polygraph violated La.R.S. 40:2531(B)(4)(a) and (c). Accordingly, Stelly's reliance on *Miller* is misplaced.

In this case, the evidence reveals that Stelly was afforded the opportunity to have an attorney present at every stage of the proceeding. It further shows that although his attorney could not be in the same room as Stelly during the polygraph, his counsel could have watched the examination from an adjoining room. We are unaware of, nor were we presented with, any law or jurisprudence that provides a police officer has an absolute right to assistance of counsel during a polygraph examination under La.R.S. 40:2531(B)(4)(a) and (c). Accordingly, we find the Board was not manifestly erroneous in ruling that the LPD complied with POBOR. The evidence reveals the Board's decision was made in good faith and for cause. We affirm the trial court's judgment upholding the Board's termination of Stelly. Stelly's assignment of error is without merit in this regard.

## CONCLUSION

The trial court's judgment upholding the Lafayette Municipal Fire and Police Civil Service Board's affirmation of Stelly's termination from his job with the Lafayette Police Department is affirmed. All costs of this appeal are assessed against Nolvey Stelly.

**AFFIRMED.**

22